THEODORE LORENC, PLAINTIFF-APPELLANT, v. CHEMI-
RAD CORPORATION, A CORPORATION, DEFENDANT-
RESPONDENT.

Argued January 22, 1962—Decided March 19, 1962.

*Mr. Bernard Chazen* argued the cause for plaintiff-appellant (*Messrs. Baker, Garber & Chazen,* of counsel; *Mr. Archie Elkins,* attorney).

*Mr. William L. Brach* argued the cause for defendant-respondent (*Messrs. Zucker and Brach,* attorneys).

The opinion of the court was delivered by

FRANCIS, J. Plaintiff, a medical doctor, received a jury verdict of $25,000 against defendant, Chemirad Corporation, for personal injuries suffered while in the course of opening a metal cylinder containing a bottle of ethylene imine. At the conclusion of the trial, defendant moved for judgment in its favor. Decision on the motion was reserved and the case was submitted to the jury, which found defendant liable. Thereafter, the trial court held that the evidence of negligence was sufficient to raise a jury question and declined to enter judgment for defendant,

notwithstanding the verdict. *R. R.* 4:51–2(*a*). On appeal the Appellate Division concluded that the record was barren of proof of want of due care, and not only reversed the award but remanded the record for entry of judgment for defendant. We granted certification. 36 *N. J.* 134 (1961).

The case was submitted to the jury on a charge which dealt exhaustively with the doctrine of *res ipsa loquitur* and of circumstantial evidence of negligence. The Appellate Division not only declared that no direct evidence of negligence was supplied by plaintiff but also that no inference of negligence could be drawn from the circumstances proved. Our study has convinced us that the facts shown provided adequate basis for permissible inferences of negligence, and therefore required the course of action taken by the trial judge.

## I.

### LIABILITY.

Dr. Lorenc, who was 39 years of age at the time of trial, was licensed to practice medicine in 1952. He was engaged in general practice in Mountainside, New Jersey. During medical school days, he took an elective course in cancer study and, as the record reveals, his interest in the subject continued thereafter. For about a year and a half prior to the accident in question, he had been experimenting with various compounds and formulas for treatment of cancer. The work was done in an improvised, or makeshift, laboratory in the garage which was at the rear of and attached to his combination home and office in Mountainside; the basement of the house was also used at times. In the course of experimentation, formulas compounded by him would be injected into mice to ascertain if they were tumor-producing, and in some cases to observe the effects on already existing tumors.

Sometime prior to October 9, 1958, he decided to experiment with a formula which included as an ingredient a

chemical known as ethylene imine. That chemical is caustic, corrosive, highly flammable, and volatile; it is dangerous when touched or inhaled.

Defendant Chemirad Corporation manufactures ethylene imine and on October 9, 1958, following a telephone call, plaintiff visited the plant in East Brunswick, New Jersey, to purchase a quantity of it. There he talked with Dr. Hans Osborg, defendant's executive director and vice president, about his experimental work with cancer and the use he intended to make of the ethylene imine. Dr. Osborg agreed to sell him 50 grams and went into the plant to obtain it. The chemical was poured into a glass bottle by a chemist, who also capped it with a bakelite cap. The bottle was then given to the shipping clerk, who completed the packing for delivery. The procedure said to have been followed was this: First, he rechecked the cap to make certain it was tight; he tightened it "a little tighter" to make "sure" it was "snug and tight." After checking for leakage, he wrapped heavy masking tape around the cap. The tape covered the sides of the cap and some of the neck of the bottle. The top surface or crown of the cap was not taped, although the proof revealed that some of the tape extended (in this instance) over a portion of the crown. The sealed bottle was put into a cylindrical metal can, which was specially prepared to receive and hold it firmly in place, as well as to absorb any possible leakage. Vermiculite, a chemically treated, absorbent material, similar to sawdust, was first poured into the can; then the bottle was inserted so as to rest thereon; more vermiculite was poured in, and a stick (of undescribed proportions) was used to pack it down and around the sides and over the top of the bottle to hold the bottle firmly in place, and eliminate movement. Thereafter, a metal top was placed on the can and masking tape drawn around its sides and over the adjoining portions of the can. Labels on both bottle and can warned the purchaser that the contents were caustic and flammable. There is no doubt that Dr.

Lorenc was aware of the dangerous qualities of the chemical he had acquired.

After receiving the container from Dr. Osborg, plaintiff said he carefully placed it in his automobile. On arriving home, he took the container into the garage, stood it, top up, in a corner near his workbench, and "propped" it in that position.

On November 23, 1958, a little more than six weeks later, Dr. Lorenc decided to unpack the bottle. He put the container on the workbench, removed the masking tape and the top. No odor was emitted (ethylene imine has a strong odor); the vermiculite appeared dry and not discolored. He tilted the container with his right hand to allow the top and side covering of the vermiculite to filter through the fingers of his left hand into a cardboard box on the bench. The intention was to stop the bottle as it slid out. While the vermiculite was sieving through his fingers, there was a sudden gush of ethylene imine over them. As this happened he caught the bottle, righted it and put it on the workbench. The entire top or crown of the cap had come off in one piece and passed between his fingers into the cardboard box. The rest or sides of the cap with the masking tape undisturbed remained in position on the bottle. The liquid had poured on the tougher palmar surface of his fingers and had run between them and around on their dorsum surfaces. On righting the bottle, he plunged the hand into a nearby water-filled basin to dilute the chemical and wash off as much of it as possible. After doing so, he put acetic acid on the fingers in a further attempt to ameliorate the corrosive effects. In spite of these efforts, severe burns were suffered, the nature and sequelae of which will be discussed at a later point in this opinion.

In the trial of the action, plaintiff charged defendant with negligence in packing the ethylene imine and in using a bakelite cap for the bottle. Some expert opinion evidence was offered to support these specific allegations but the substance of it was either rejected or stricken on motion by

the trial judge, or removed from jury consideration in the course of his charge. At the close of the plaintiff's case, however, defendant's motion for dismissal was denied on the theory of *res ipsa loquitur*. Of course, allegations of specific acts of negligence in pleadings or pretrial orders, or efforts to prove such acts at trial, do not preclude reliance upon *res ipsa loquitur* where the facts warrant its application. *Reiter v. Max Marx Color & Chemical Co.*, 35 *N. J.* 37, 42 (1961).

In defense, Chemirad established the manner of packaging the ethylene imine, as has already been described above, and Dr. Osborg testified that approval of the method had been obtained from the United States Bureau of Explosives. He asserted, as well as an expert witness produced by defendant, that bakelite caps are suitable and in frequent use for capping bottles containing ethylene imine. It was shown, however, that Dr. Osborg had given an answer to interrogatories which reflected somewhat on that proof. The question and answer follow:

"Q. State fully and completely and in all details the type of container in which the aforesaid ethylene imine was packed, the manner in which it was packed, the type of cork used?

A. Ethylene imine is poured into a glass bottle. This glass bottle is closed with a cap, *preferably a steel cap*, which is lined with a polyethylene washer, \* \* \*." (Emphasis ours)

On another occasion, while testifying in a pretrial deposition, he was asked:

"Q. What type cap did you use?"

He answered:

"Steel caps."

On direct examination by defense counsel at this trial, the following appears:

"Q. And has your company in shipping this particular size bottle used both steel caps and bakelite caps?

A. Yes, but the steel caps for this particular size usually sit on the shoulder of the bottle, and may not provide as tight a seal at the mouth of the neck of the bottle as this bakelite cap does.

Q. Well, are there circumstances under which the steel caps are preferable for shipping ethylene imine?

A. No, not necessarily. For larger bottles it's the general feeling that the larger the bottle the more you prefer to have a steel cap on it instead of a plastic cap."

The obvious conflict in these answers was not reconciled. As we read the record, the doctor's attempted explanation on cross-examination of the interrogatory answer, that it "refers to the entire packing, not just one little bottle," is not very enlightening or satisfactory. In any event, assuming the case was properly submitted to the jury for consideration, evaluation of the answer and explanation was a problem for that fact-finding body.

During the examination of defendant's witnesses, plaintiff suggested on the basis of the packing clerk's testimony about his practice to tighten the cap a little more after the bottle came to him from the chemist to make sure that it was snug and tight, that in doing so he may have cracked or started a crack somewhere along the edge of the crown of the hard but brittle bakelite cap, where the sides join the crown. The witnesses maintained they had never seen such an occurrence and expressed the view that an ordinary man did not have strength enough in his hands to cause it. In this connection, an odd incident took place. Defendant had put in evidence certain bottles and caps of the same type as given to plaintiff, and had passed them to the jurors for examination. When they were collected, it appeared that the cap of one was broken. On inquiry by the court, a juror announced that he had broken it with his hands. The matter was dropped at that point. Defense counsel did not attempt any inquiry as to just how the juror had accomplished the breaking; nor did he request the court to instruct the jury then, or in the charge, as to the significance of the event, if any, on the case of the defense. It may be noted, however,

and that the juror who broke the cap voted for the defendant. that the jury verdict followed a 10–2 vote for the plaintiff,

Perhaps the most important aspect of the defense rested in the claim that if a through and through crack was already in the bakelite cap prior to, or occurred during, or on account of the manner of packing the bottle, the highly volatile imine would have evaporated within the six and one-half weeks that elapsed between delivery to plaintiff and the accident. A basic assertion was that a bakelite cap would not be cracked part way through; if a crack existed at all it would necessarily go completely through the brittle material. Such a crack would permit air to enter and the volatile imine to vaporize. The Appellate Division, in ruling for defendant, said that the "proofs established beyond controversy  *  *  * that if there had been any crack in the cap, even a hairline crack, prior to the time plaintiff opened the metal container, the chemical would have vaporized, leaving a tell-tale odor and a honey-like deposit." It also accepted as a matter of law the conclusion that if any such through and through crack existed on delivery of the bottle, the chemical would have evaporated in the period intervening before plaintiff's accident. In our judgment, the record, viewed as it must be most favorably to the plaintiff, cannot be said to be so barren of contrary inferences as to require removal of the case from jury consideration.

The testimony does reveal plainly that a crack or hole of through and through proportions in the bakelite cap would permit the ethylene imine to escape in six and one-half weeks. But the evidence does not show beyond dispute either that under any and all conditions the result would follow, or that under the conditions existing in Dr. Lorenc's garage during the period in question, the result was inevitable. Defendant offered expert proof to the effect that if there had been a leak in the cap the ethylene imine vapor would have escaped in the period of six weeks "at a temperature, I think, of *about 70 degrees Fahrenheit or [on?] the average.*" (Emphasis ours.) But the chemical

was purchased on October 9, 1958, and the accident took place on November 23, 1958. No proof was adduced either as to the outdoor temperature or the temperature in the garage during that period. Moreover, whether the garage was heated was not shown. Apparently conscious of the season of the year involved, counsel for defendant asked about evaporation at temperatures "somewhat lower, 40 to 50 degrees." The expert answered that "it would still escape rapidly." He did not say, however, that under such temperatures or under those prevailing in the garage during the period, the liquid would have evaporated completely. Dr. Osborg said that if a leak had existed at the time of packing "practically all, if not all" of the imine would have evaporated and been absorbed in the vermiculite in the six weeks. In view of this testimony it is improper, in our view, to say that all the facts and inferences therefrom establish conclusively that given a crack of any proportions at all in the cap, complete evaporation would have taken place before plaintiff undertook to remove the bottle from the container.

Additionally, it should not be forgotten that defendant's packer, after tightening the cap a little tighter to make it snug and tight, wrapped substantial masking tape around it. There is no dispute that the tape extended over the sides of the cap and over onto the crown. The court observed this at the trial, as did defense counsel, who remarked that the tape did not go up over the crown all the way around. The tape was still in place at the time of trial; it had never been removed after the packer had put it there. There is no substantial proof to the contrary. No testimony was offered by the defense as to whether, if a small crack had come into existence during packing, the tape could have held the fractured segments in place so as to prevent escape of the imine vapor, or slow the escape down to minimal or imperceptible proportions. Plaintiff's expert Gerardi indicated plainly that such type of rupture could occur. He agreed that if the crack "was open

* * *," "in all probability there would not have been any liquid left to flow from the bottle." Defense counsel then asked him:

"Q. It really depends upon how big the break is, doesn't it?
A. Yes."

Although the defense testimony is in disagreement, plaintiff's experts Gerardi and Thornton, who had worked and experimented with bakelite caps of the type used by defendant, said such caps have a low modulus of rupture and can be broken or cracked by hand while being tightened. After study of the cap, a defense expert said the break was "positively a mechanical break" and there was no sign at all of chemical attack as a possible cause. He was asked if there was any observation he could make as to the cause and replied:

"A. Well, the nature of the molded bakelite cap involves what we call a re-entrant angle at the point where the threads, that is, above the threads, makes a very sharp angle inside there, and that of course is the position mechanically of the greatest weakness, if a break should occur, that is, it might start there and go, not necessarily follow all the way. * * *."

Having taken the position that the cap could not be broken by hand tightening, defense then suggested that minute marks appearing on the masking tape indicated that some instrument had been used, probably small pliers, in an attempt to take off the cap, and that such operation was responsible for the breaking away of the crown from the body of the cap. Not only does defendant advance that contention but it says also that the person who used the pliers mistakenly attempted to remove the cap by turning it the wrong way, i. e., clockwise, and so broke it. Of course, turning it the correct way would have had the tendency to loosen rather than tighten it.

Quite obviously the jurors disbelieved the defense experts that the breaking of the cap happened in the fashion thus

intimated. There was ample basis for them to do so. The evidence was substantial that the masking tape had never been removed and was still in its original position when they examined the cap. The fact was not denied by defendant. Dr. Lorenc's testimony was clear that he had not removed it and that he did not use pliers or any instrument in an effort to remove the cap. In our view, the jury might well discount as bizarre and incredible the intimation that a person of the plaintiff's obvious intelligence and of some scientific training and experience would attempt to unscrew the cap, either with or without pliers, without first taking the masking tape off.

The masking tape is an important circumstance in evaluating plaintiff's claim. Assuming that defendant's packer tightened the bakelite cape so snugly that a small rupture occurred at the edge of the crown, at the angle of turn or joinder of the sides and crown (an inference we believe to have been legitimately open to the jury), the rupture may have been covered over immediately by the masking tape and held tightly in place so as to permit either no escape of imine vapor or such a minute quantity as to allow some of the chemical to remain in the bottle until plaintiff undertook to open the metal container. Moreover, if the jury believed the plaintiff's version of the mishap, in considering the problem whether the cap had been damaged by the packer, the proof that after the masking tape had been put on he used a stick to pack the vermiculite tightly below, around and above the imine bottle, presented a reasonable basis for an inference that the stick was a causative factor in the rupture.

Defendant offered evidence to the effect that if there was a break in the cap at delivery to plaintiff, unmistakable proof of it would have appeared on the outside of the bottle at the time of unpacking. A honey-like deposit would have been caused by contact between the ethylene imine vapor and the air. No such substance was shown to have been present. It is noted, however, that defendant's chemical

consultant suggested that frequent handling—"manhandling" —of the bottle after the accident could have removed the deposit. The defense said also that the vermiculite would have become discolored through absorption of the vapor and the escaping vapor would have been accompanied by a strong, pungent odor. Plaintiff saw no such discoloration and smelled no odor. It is true, as the Appellate Division indicated, that these facts tended to negative a *leak* in the cap. But under all the circumstances it did not negative, to the point where reasonable men would not differ, an inference that a *break or crack* existed which either did not permit vapor to escape or permitted it to escape in such minute quantity as not to produce the total result claimed by defendant. Finally, in this connection, if the jury found such a rupture had been created, it would be reasonable and consistent with that inference to conclude on all the facts that when plaintiff tilted the container, and thus the bottle, the flow of the imine to and against the damaged top caused the rupture to complete and the crown to fall off.

Much emphasis is placed by defendant and the Appellate Division on the testimony that bakelite caps are in common or "standard" use on bottles containing ethylene imine. But the evidence shows that other types, such as teflon (which is more expensive) and metal, may be and are used. Assuming that these latter types are no better than bakelite so far as reaction to the bottled chemical is concerned, defendant offered no proof that their modulus of rupture was the same as or lower than that of bakelite, *i. e.,* that they were just as subject to break or crack on hand or physical pressure or on being struck by a packing stick as the brittle bakelite. It cannot be said that a jury would not be justified in determining that the metal cap, at least, would not be as subject to break. In the total factual context of the case, particularly in the light of Dr. Osborg's sworn answer that metal caps were preferable, the absence of such comparative proof should not be ignored. Moreover, this state of the record gives more body to Gerardi's testi-

mony that on the basis of his experience with bakelite caps he would not recommend their use as a means of topping bottles containing such caustic and dangerous liquid. He said bakelite is a plastic and because "of the configuration of the molecules and the rearrangements that occur in the plastic when the material is made, it is not possible to definitely discern certain stress and strain characteristics as you would get it on glass, or on metal."

It is true that the trial court struck out the opinions of both Gerardi and Thornton as to the cause of the crown's coming off as plaintiff was in the course of removing the bottle from the metal container. Their theory (Gerardi's being based on Thornton's) was that pressure had built up inside of the bottle to such an extent that it blew the crown off coincidentally with the unpacking. Since neither had any experience with alleged pressure creating capacity of the chemical, they were declared, and rightly so, to lack the expertise which would qualify them to advance the specific opinion. But their testimony about the low rupture point of such bakelite caps and that they can be cracked by pressure in tightening them was not expunged; nor was their recommendation (based on that reason) against use of bakelite caps for bottles containing corrosive liquids stricken from the record. Their lack of experience with ethylene imine as such (which everyone conceded is a highly corrosive chemical) did not render them incompetent in the light of their proved qualifications to testify as to the nature and qualities of such caps or to express their view, for such weight as the jury chose to give to it, that they would not recommend employment of bakelite caps in the bottling of corrosive liquids. The trial judge declined to strike out Gerardi's testimony in this regard, although, as has been said, he did grant the motion to exclude the witness's opinion about the crown's coming off because of excessive ethylene imine vapor pressure within the bottle. The Appellate Division declared that his entire testimony opposing the use of bakelite caps should have been removed

from the case. For the reasons stated, we concur in the trial court's action.

■ *Res ipsa loquitur*, which formed the core of the trial court's charge to the jury, is simply an emanation of the basic legal doctrine that a verdict in a negligence case may rest on circumstantial evidence. If the phrase itself had never been coined, undoubtedly the procedural result it has produced over the years in the cases to which it has been applied, *i. e.*, submission to the jury of the question of the defendant's liability, would have been the same. The issue for determination would simply have been presented in terms of permissible inferences of negligence from the facts proved.

In its origin and early use the phrase did take on some rather clearly defined contours. It was said to be applicable when (1) the accident which produced a person's injury was one which ordinarily does not happen unless someone was negligent, (2) the instrumentality or agency which caused the accident was under the exclusive control of the defendant, and (3) the circumstances indicated that the untoward event was not caused or contributed to by any act or neglect on the part of the injured person. In such a situation an inference of negligence by the defendant is allowable. *Prosser on Torts* (*2d ed.* 1955), *p.* 199. Modern manufacturing, packing, shipping and marketing conditions, however, brought the realization that to hold strictly to the view that inferences of negligence became permissible only on proof of exclusive control of the injuring agency at the time of the mishap would largely destroy the efficacy of the principle. The result was a sensible and logical broadening so as to permit the inference where the total circumstances showed a probability that defendant's lack of due care while the agency was in his possession and control was responsible for the casualty, and eliminated the probability of efficient participation by some other cause. *Bornstein v. Metropolitan Bottling Co.*, 26 *N. J.* 263 (1958); *Alston v. J. L. Prescott Co.*, 10 *N. J. Super.* 116 (*App. Div.*

1950); *Prosser, supra, pp.* 204–209; 1 *Frumer & Friedman, Products Liability* § 12.03[3] (1960). Harper & James suggest that as generally applied the requirement for exclusive control "is more accurately stated as one that the evidence must afford a rational basis for concluding that the cause of the accident was probably 'such that the defendant would be responsible for any negligence connected with it.'" 2 *The Law of Torts* (1956), *p.* 1086. The present contours of the principle represent no more than an effort on the part of the law to adapt itself to the current environment.

■ Application of the principal of *res ipsa loquitur* at the trial of cases must be engaged in with regard for the nature of its impact on the facts. Where the facts of a particular situation warrant its invocation, an inference of negligence may be drawn; it is not compelled. The facts are said to provide circumstantial evidence of negligence to be weighed, but not necessarily to be accepted as sufficient; they afford a basis for an inference of want of due care which the jury may, but need not, draw. Even in the absence of explanation by the defendant, the jury may properly conclude that the inference should not be drawn or that the facts are not adequate to sustain the plaintiff's ultimate burden of showing, to the degree required, the origin of the accident in the negligence of the defendant. *Sweeney v. Erving,* 228 *U. S.* 233, 33 *S. Ct.* 416, 57 *L. Ed.* 815 (1913); *Marzotto v. Gay Garment Co.,* 11 *N. J. Super.* 368, 375 (*App. Div.* 1951), affirmed 7 *N. J.* 116 (1951).

■ The charge to the jury here was a clear exposition of *res ipsa loquitur* in the terms outlined. Defendant asserts no error in that regard. The sole claim is that the principle was not available to plaintiff on the facts in the case. We find no merit in the contention.

Ethylene imine is a dangerous corrosive chemical carrying a high potentiality for injury on contact with the skin. Defendant was fully aware of its quality and thus under a duty in handling and packing it to exercise care commen-

surate with the risk. The liquid and the packaging materials were fully under the defendant's control. Its agents poured it into the bottle, capped, packed and delivered it to plaintiff. If the plaintiff's testimony was accepted, and the jury obviously did so, there was no proof to indicate conduct on his part which bore any causal connection with the accident. Thus it was shown circumstantially that when the plaintiff undertook to unpack the bottle, both it and the container were in the condition which existed at the time of delivery to him. Moreover, there was nothing in plaintiff's explanation of the method of unpacking to suggest that the bakelite cap might have become cracked or the crown broken off in the process. Consequently, on the basis of the proof that when the container and bottle were tilted downward, and the imine necessarily brought in contact with the crown of the cap, the crown came off or broke off, causing the chemical to pour over plaintiff's fingers, an inference of failure of due care in the packing is clearly and legitimately permissible. See *Jesionowski v. Boston & Maine Railroad*, 329 *U. S.* 452, 67 *S. Ct.* 401, 91 *L. Ed.* 416 (1947) ; *Alston v. J. L. Prescott Co.*, supra; *Furness, Withy & Co. v. Carter*, 281 *F. 2d* 264 (9 *Cir.* 1960) ; *Gerard v. American Airlines, Inc.*, 272 *F. 2d* 35 (2 *Cir.* 1959) ; *Ozark v. Wichita Manor, Inc.*, 252 *F. 2d* 671 (5 *Cir.* 1958), rehear. den. 258 *F. 2d* 805 (5 *Cir.* 1958) ; *Hotel Dempsey Co. v. Teel*, 128 *F. 2d* 673 (5 *Cir.* 1942) ; *Diesbourg v. Hazel-Atlas Glass Co.*, 176 *F. 2d* 410 (3 *Cir.* 1949). As the court said in *Jesionowski*, if the proof of plaintiff's connection with or handling of the container and the bottle were regarded as preventing application of the doctrine, juries would be barred "from drawing an inference of negligence on account of unusual accidents in all operations where the injured person had himself participated in the operations, even though it was proved that his operations of the things under his control did not cause the accident." 329 *U. S.*, at *p.* 457, 67 *S. Ct.* at 404. Accordingly, we conclude that the trial court properly submitted the case to the jury for determination.

The overall impression conveyed by the whole of defendant's argument is that plaintiff's version of the injurious incident is so unworthy of belief as to require refusal to accept it. Acceptance of such a contention by an appellate tribunal in the face of facts of the nature of those appearing in the record, would constitute an invasion of the province of the jury.

## II.

### DAMAGES.

Defendant argues that the verdict of $25,000 is so excessive as to indicate mistake, passion or prejudice. A motion for new trial on that ground was rejected by the trial court.

There is agreement between the parties that ethylene imine is highly corrosive and capable of causing severe burns. Dr. Lorenc said it would cause necrosis, or death of tissue, on contact.

When the chemical gushed out of the bottle, it ran over the palmar surfaces of the middle, ring and small fingers of the left hand, between the fingers and around and onto the dorsum or back of the fingers. It produced third degree burns of the backs of the fingers, which involved the deepest layers of the skin. They were painful and required treatment for a long period of time. Crumbled areas of dead tissue appeared and all of the skin sloughed off. Eventually "some little islands of skin" developed and they grew so as to cover the burned areas. Extensive and permanent scarring remains and there is some limitation of use of the fingers. The new skin is very delicate; it is thinner than normal and breaks down and ulcerates at intervals. Although plaintiff does not specialize as a surgeon, before the accident he frequently participated as an assistant at operations. Medical testimony was adduced to show that on many occasions thereafter he could not act in that capacity because the skin had broken down and open wounds were present. Moreover, it was painful for him to engage in the necessary

"scrubbing up" for operations. The brush hurt and irritated the fingers and plaintiff was constantly fearful about the skin's breaking down.

Plaintiff testified also that he has become very apprehensive about the development of cancer in the fingers because of the intermittent breaking down and the chronic ulceration. Such breaking down he believes to be conducive to malignancy and every time it occurs he worries whether a malignancy is beginning. Moreover, after this accident he injected ethylene imine solutions into mice over a period of time and found that malignant tumors appeared. Thus he came to believe that imine in some solutions was helpful in the treatment of cancer and in other solutions cancer-inducing. The latter result increased his concern about the possibility of a personal malignancy, even though he had had a single exposure to the liquid. A specialist in the field of cancer produced by defendant asserted positively that no scientific evidence existed indicating that ethylene imine was cancer-producing in humans.

As time went on and pain persisted in the hand and arm, he began to experience restriction of motion in the left shoulder. At the trial over a year and a half after the accident, he described the shoulder as "frozen." The incapacity of the hand due to the condition of the fingers, and the restriction of the shoulder, he said, have limited considerably his assistance at operations and have interfered with his practice. He has difficulty in the reduction of certain types of fractures and has found it necessary to give up obstetrics completely.

Dr. Alan L. Jacobs, one of the treating physicians, asserted that the chronic ulceration indicates potential malignancy. He characterized the condition as probably premalignant, and said that when burns constantly reopen and ulcerate "there is a strong danger of malignancy." He considered the impaired use of the hand to be permanent. This physician also observed the restricted shoulder movement which he seemed to attribute to the hand condition

and the accompanying lack of use of the arm and shoulder. In his opinion, the restriction had become fixed.

An orthopedic specialist testified that he had examined plaintiff's left arm and shoulder in February, and had been treating the conditions since, but he did not specify the nature of the treatment. He found atrophy of the shoulder muscles and restriction of motion which he considered permanent and attributable to the accident. Although the process by which the burns of the hand produced the condition was not described very clearly, the indication given was that it developed through the lack of use of the arm which was associated with plaintiff's "protective action" for the hand. He agreed that restrictions like this frequently responded to treatment and exercise, but did not think in plaintiff's case recovery would come about.

Dr. Jacobs, who treated the burns, felt in the early stages of the treatment that a skin graft ought to be done. He said Dr. Lorenc was not "particularly certain of this"; nor was he "completely certain." In January 1959 some healing of the skin began which surprised him and he then said to the plaintiff: "We don't have to do a skin graft. It's healing." But in view of the subsequent intermittent breakdowns, he told plaintiff "recently" (speaking apparently with relation to the time of trial) that he thought a skin graft would have to be performed. If done successfully, the chance of cancer would probably be eliminated.

Dr. Jacobs testified further that more than one skin graft operation might have to be done. 70 to 80% of such operations are ultimately successful, however. But even if successful, not only would the new skin be inferior, but plaintiff's hand would not be restored to its normal function. He indicated also, both in terms of possibility and probability, that if the skin graft had been performed earlier, the freezing of the shoulder would not have happened. But he said that after deciding not to do a skin graft "by the time I changed it back to skin grafting, which is quite recent, he already had a stiff shoulder, and

I don't think anything I would have done with that hand would have changed his shoulder."

█ Defendant charges that it was improper to permit the jury to consider the testimony as to plaintiff's concern over the chance of future malignancy for two reasons. First, because the testimony was couched in terms of possibility rather than probability of cancer, and second, because plaintiff had refused a skin graft which, his own medical evidence indicated, would eliminate or minimize the possibility of cancer. As to the first ground, it must be conceded that analysis rather strongly suggests plaintiff and his supporting physician were thinking of possibility rather than probability of malignancy. But in answer to some specific questions, calling for selection, they expressed that result in terms of probability. And the language they employed was such as to preclude a court from holding as a matter of law that a factual question requiring determination by the jury did not exist as to whether the future onset of cancer was probable. Moreover, as to the claim that an affirmative finding by the jury on that subject was contrary to the weight of the evidence, the test is not whether the appellate court would have found as the jury did on a particular aspect of the damage claim, but whether the evidence as revealed by the record, if believed by the jury, provides reasonable support for the verdict. So, although, if we were acting as original triers of the fact, we might have rejected the claim of probably resulting cancer, as distinguished from a neurosis based on a fear of development of that disease, we cannot say there was no justification for a finding favorable to plaintiff regarding its probable future onset. In addition, there is no way of knowing from the verdict whether the jury accepted the suggestion of probable future cancer, or simply allowed some compensation for the plaintiff's fear of development of that disease. And with respect to compensation for a malignancy, the trial court instructed the jury that in order to make an award therefor they must find, by the greater weight

of the believable evidence, that plaintiff has shown "he will probably develop malignancy because of this injury."

As has been indicated above, the second reason urged by defendant in support of its argument that the malignancy aspect of the damage claim should not have been submitted to the jury, is that plaintiff's refusal to submit to a skin graft bars recovery therefor. Plaintiff testified that skin grafting for burns is a common procedure. He conceded that "it would have been the best possible precaution" to prevent cancer, and that it would "minimize" some of his fear of it. Dr. Jacobs recommended that course "very early" in his treatment, but plaintiff was "hoping he was wrong." Dr. Jacobs sent him to a Dr. Atkinson for an opinion on the matter. It does not appear whether this consultation was before or after Dr. Jacobs decided that skin graft was not necessary because of the onset of healing of the burns. Dr. Atkinson's opinion was not given. But as has been noted above, it was not until "recently" (in relation to the date of trial) that Dr. Jacobs again reached the conclusion that skin graft was advisable. No medical witness suggested that any peril to life or undue risk to health or extraordinary suffering was associated with such surgery. The defense cancer specialist described it as ordinary procedure. He denied that a malignancy would result from chemical burns like the plaintiff's but conceded that cancer sometimes, though rarely, follows heat burns. In such cases, after immediate treatment for the burn, if the skin is not healed, the proper treatment is skin grafting, both for cosmetic reasons and to eliminate the remote possibility of cancer at a later date. Dr. Jacobs said the chance of success—of preventing the further breaking down of the burned skin—through the skin graft was 70–80% but that more than one such operation might be required. Further, as has been noted above, in his opinion a complete cure would not follow from a successful graft. The new skin would be inferior and the pre-accident freedom of use of the fingers and hand would not be restored.

Lorenc's explanation for failing to undertake the graft was that he could not afford to be away from his practice for the necessary period, "about two months," and also that as a doctor he is in a "better position than the average individual" to watch the condition of his fingers and if a malignancy starts "to excise it at that time."

The trial court submitted to the jury the question of the effect on plaintiff's claim for damages of his failure to submit to the recommended surgical intervention. The charge pointed out that a person who is injured by another's wrong is obliged to exercise ordinary care to seek medical and surgical treatment for the purpose of relieving his pain and suffering as well as consequent disability, and thus to mitigate damages. The jurors were instructed also that:

"The refusal to accept an operation is not unreasonable * * * unless it is free from danger to life and health and extraordinary suffering and according to the best medical and surgical opinion offers a reasonable prospect of restoration and relief from disability. And reasonableness of refusal is a question of fact for you ladies and gentlemen of the jury to determine, whether or not the doctor's refusal to submit to a skin graft was reasonable on the grounds that it was dangerous to his life and health and worked extraordinary suffering."

The rule applicable in New Jersey with respect to the duty to submit to an operation was set forth in *Robinson v. Jackson,* 116 *N. J. L.* 476, 478 (*E. & A.* 1936), as follows:

"The right of the employer to impose medical or surgical treatment upon the injured employee is not, of course, an absolute one. Compulsion in such matters must needs be cautiously exercised. The employer's right in this regard is necessarily circumscribed by the correlative right of the employee to avoid, if he chooses, peril to life, however slight, and undue risks to health, and anguish that goes beyond the bounds of reason. The employee's refusal to submit to the tendered treatment, whether medical or operative, is not unreasonable, and therefore unjustifiable in the legal sense, unless it is free from danger to life and health, and extraordinary suffering, and, according to the best medical or surgical opinion, offers a reasonable prospect of restoration or relief from the disability. And the reasonableness of the refusal, tested by this standard, is one of fact."

See also, *Budden v. Goldstein*, 43 *N. J. Super.* 340, 349–350 (*App. Div.* 1957); *McCaffrey v. Schwartz*, 285 *Pa.* 561, 132 *A.* 810 (*Sup. Ct.* 1926); *Blate v. Third Ave. R. Co.*, 44 *App. Div.* 163, 60 *N. Y. S.* 732 (*App. Div.* 1899); Annotation, 48 *A. L. R.* 2d 346 (1956). Although Dr. Lorenc's testimony as to the reasons for his failure to accept a skin graft is not very impressive, and although his reasons reflect adversely upon his assertion of fear of malignancy, and even upon the present need for any such surgery, we feel that the circumstances in their totality warranted submitting to the jury the issue of reasonableness of the failure and the effect, if any, that such failure should have upon the damage claim.

Defendant argues also that the proof demonstrates that if an early graft had been performed, the alleged frozen shoulder probably would not have developed. It is true that such testimony was elicited from plaintiff's Dr. Jacobs. But the argument overlooks the further testimony as to his change of mind on account of the rather unexpected onset of a healing process in the burned fingers. The decision against the operation, he said, continued until shortly before the trial when the persistent intermittent breaking down of the skin persuaded him to return to his original opinion. The significance of this proof in relation to the contention under consideration stems from the doctor's further statement that in the interval between the two decisions, the shoulder condition had arisen and had become fixed. Obviously, a good faith medical judgment, even if a mistaken one in the light of subsequent events, would not bar consideration of disability flowing from the course pursued.

Two medical examiners for the defense found the rather extensive scarring of plaintiff's three fingers but no limitation of motion in them. However, there were complaints of a pulling feeling in the scar area on full flexion and on making a fist. One doctor, who examined about six months after the injury, spoke of a complaint of numbness of the fingers. He found the skin puckered over the scarring and

somewhat atrophic, which meant that it was thinner than normal skin. Being thinner, it would be more susceptible to further chemical burns or to blows or to scrubbing with a brush in preparation for an operation. It is "possible," he said, that scrubbing would cause the thin skin to break down but he did not think it was probable; the skin could take "almost as much punishment" as normal tissue. This doctor re-examined plaintiff's hand on the date of his court appearance, 19 months after the accident. On that day the condition he found on the first occasion was still present.

The second doctor examined on defendant's behalf 11 days before trial. In addition to the finger scarring, he found some atrophy of plaintiff's left shoulder but he regarded the movements of the joint to be within normal range. Since plaintiff is right-handed, he did not regard the atrophy as of any significance. He found no sign of any permanent limitation in the arm or hand, and felt that in the future, "if anything he'll get better. He will improve." Then he said that, having in mind the length of time between the accident and his examination, he believed the condition he found is "more or less of a permanent status."

As can be seen from our outline of the medical testimony and plaintiff's complaints, there is a substantial area of conflict as to the effect of the burns upon plaintiff and upon his ability to practice his profession. Plaintiff was 39 years of age at trial. His life expectancy was 32 years. If his testimony and that of his medical friends who treated him was credible, the $25,000 verdict cannot be considered so excessive as to indicate mistake, passion or prejudice. Frequently in personal injury negligence cases the discordant statements and opinions as to the nature of the injuries leave ample room for variant conclusions. In the last analysis the jury must undertake an evaluation of the veracity of the disputing witnesses and base the damage award upon the judgment they reach. That process is of the essence of our trial procedure, and this case is no exception to the rule. The jurors saw and heard the witnesses and quite

obviously found that plaintiff had established his cause of action, both as to liability and damages in the sum awarded, by the greater weight of the believable evidence. Likewise, the experienced trial judge, who had the same opportunity as the jurors, did not regard the verdict as excessive. We cannot say that the result was so without legal justification as to warrant interference by an appellate tribunal.

All of the other grounds urged for reversal have been considered and found to lack merit.

## III.

### THE INADEQUATE APPENDIX.

Before concluding, we feel compelled to make some observation about the appendix furnished to the Appellate Division and to this court by the parties. *R. R.* 1:7–1(*f*) requires the appendix to contain:

"* * * such parts of the record as are essential to the proper consideration of the issues, and which the appellant desires the court to read, including such portions which the appellant reasonably assumes will be relied upon by respondents in meeting the issues raised. * * *"

Quite obviously, therefore, *appellant's* appendix should contain all of the testimony which *both* parties would reasonably wish the court to study in deciding the appeal. Anything short of such a record is not sufficient and violates the rule.

The appendix supplied in this case, the responsibility for which rested primarily with the defendant because it sought the review in the Appellate Division, clearly transgresses the cited rule.

The appendix filed in the Appellate Division by defendant contained *portions* of the direct and cross-examination of the following witnesses:

> Dr. Theodore Lorenc
> Carmine Gerardi (an expert for plaintiff)
> Dr. John P. Warter (plaintiff's orthopedic specialist)

Dr. Alan L. Jacobs (plaintiff's treating physician)
Alfred K. Thornton (an expert for plaintiff)

For defendant:

Dr. Hans Osborg (defendant's executive director)
William Ter Horst (defense expert)
Dr. Fulton Massengill (examining physician)
Clinton Lee Foltz (defendant's packing clerk)
Dr. Stephen S. Sternberg (cancer specialist)
Dr. Roy Allen (chemical consultant)
Dr. Marvin Fuchs (examining physician)

In an apparent effort to present the testimony of the listed witnesses so as to aid in its evaluation, plaintiff found it necessary to furnish an appendix of his own. It contained some further *portions* of the direct and cross-examinations of each witness. Defendant then filed a reply brief and supplemental appendix which added some further direct or cross-examination or both of Foltz, Gerardi, Ter Horst, Jacobs, Osborg and Thornton.

On the petition for certification in this court, plaintiff added a supplemental appendix containing some further excerpts from the direct and cross-examination of Lorenc, Osborg, Ter Horst, Allen and Thornton. In opposition to the application, defendant presented a brief and "second supplemental" appendix which added a few more questions and answers of Gerardi, Osborg and Thornton.

Following the certification, defendant submitted to this court a "third supplemental" appendix. It contained a small portion of the direct examination of Osborg, some answers by plaintiff to interrogatories, two questions and answers on his pretrial deposition, and a single question and answer on the cross-examination of Thornton.

Presentation of such a record to the Appellate Division or to this court is not only improper but the departure from the rule is especially difficult to understand in this case because, in addition to urging specific grounds of appeal,

defendant contended that plaintiff's verdict was contrary to the weight of the evidence both as to liability and *quantum* of damages. Where such grounds are urged, appellant's duty, with very rare exceptions, is to include the entire testimony in the appendix. This case is an illustration of the need for adherence to the rule. After shuttling back and forth in the jig saw of excerpts, it soon became apparent that the interests of justice could be served only by obtaining the full stenographic transcript of the testimony, and we did so.

When defendant's Appellate Division appendix was served, plaintiff should have moved to dismiss the appeal or, in the alternative, for an order requiring printing of the complete record. And dismissal should have been granted unless defendant agreed to supply the proper appendix forthwith.

## IV.

The judgment of the Appellate Division is reversed and that of the Law Division is reinstated.

*For reversal*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.