785 F.2d 79
 54 USLW 2520, 20 Fed. R. Evid. Serv. 272,
Prod.Liab.Rep.(CCH)P 10,955
 Lester R. HERBER, Appellant in No. 85-5185,
v.
JOHNS-MANVILLE CORPORATION; Johns-Manville Sales
Corporation; Lake Asbestos Co., Inc.; North American
Asbestos Co., Inc.; Philip Carey Company, a Division of
Panacon Corporation (a/k/a Carey Canadian, a subsidiary of
Jim Waters, Inc.); Raybestos-Manhattan, Inc.;
Owens-Corning Fiberglas Corporation; Forty-Eight
Insulation, Inc.; Nicolet Industries, Inc.; Pittsburgh
Corning Corporation; GAF Corporation; Celotex Corporation;
Armstrong Cork Company; Unarco Industries Inc.; H.K.
Porter Co., Inc., Thermoid Division; Southern Asbestos
Company; J.P. Stevens, Inc.; Eagle- Picher Industries,
Inc.; Amatek Corporation; Delaware Asbestos and Rubber
Company; Dacor Inc.; Fiberboard Corporation, Pabco
Industrial Products Division; Keene Corporation; Glen
Aldon, Inc.; Rapid American, Inc.; Turner Newall Ltd.;
Keasbey Mattison Company; Certain Teed Products
Corporation; U.S. Rubber Co., Inc.; Asbestos Textile
Institute Inc.; Uni-Royal Inc.; Carolina Asbestos Company;
J. Franklin Burke Co.; General Asbestos Co.; Asbestos
Textile Co.; Ruberoid Company Inc.; and John Doe(s).
Appeal of EAGLE-PICHER INDUSTRIES, INC., Appellant in No. 85-5258
 Nos. 85-5185, 85-5258.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 3, 1985.
Decided March 5, 1986.
Rehearing and Rehearing In Banc Denied April 3, 1986.
 
 James J. Pettit, Neil R. Peterson (Argued), Greitzer & Locks, Philadelphia, Pa., for appellant Lester R. Herber.
 Andrew T. Berry (Argued), Gita F. Rothschild, Honora M. Keane, McCarter & English, Newark, N.J., for defendants-appellees Pittsburgh Corning Corp. and Eagle-Picher Industries.
 James F. McNaboe, Jeffrey A. Cohen, Schwartz & Andolino, P.A., Livingston, N.J., for defendant-appellee and cross-appellant, Eagle-Picher Industries, Inc.
 James E. Farrell, Jr., Terrence P. McGeever, Joseph D. Szczepaniak, Curran, Mylotte, David & Fitzpatrick, Westmont, N.J., for appellee Pittsburgh Corning Corp.
 Donald S. MacLachlan, Connell, Foley & Geiser, Newark, N.J., for H.K. Porter Co., Inc. & Southern Textile.
 Before ADAMS, GIBBONS, and STAPLETON, Circuit Judges.
 OPINION OF THE COURT
 STAPLETON, Circuit Judge:
 
 
 1
 The judgment in this diversity action was entered on a jury verdict finding the appellee asbestos suppliers liable to appellant but awarding him no damages. This appeal raises a number of important issues which have been debated for some time in federal and state asbestosis litigation in New Jersey.
 
 
 2
 The appellant, Lester R. Herber, charges that the district court abused its discretion and misapplied New Jersey law when it excluded evidence of three elements of his alleged damage: present increased risk of a possible future cancer, future cost of medical monitoring to detect the presence of cancer, and emotional anxiety resulting from fear of cancer. We predict that the Supreme Court of New Jersey would disagree with appellant's position on the first element of damage. However, we believe that Court would agree with appellant as to the other two elements. Accordingly, we reverse and remand for further proceedings.
 
 I. THE PROCEEDINGS BELOW
 
 3
 In the course of his employment as a pipefitter, Mr. Herber was exposed to asbestos products. In 1978, he was diagnosed as having pleural thickening, a condition associated with exposure to asbestos. He brought a products liability action against appellees in the district court claiming damages under a strict liability theory. The court denied Herber's proffer of evidence that his exposure to appellees' asbestos had increased the risk of his developing a cancer. The court did so on the alternative bases of insufficiency under New Jersey tort law and undue prejudice under Federal Rule of Evidence 403. This ruling prevented Herber from seeking damages from the jury for the increased risk of developing a future cancer, the future cancer itself, the cost of medical monitoring for signs of cancer, and fear of the future cancer.
 
 
 4
 A jury, in special interrogatories, found that Herber's lungs manifested exposure to appellees' asbestos products, that appellees were liable for any harm caused by this exposure, that Herber had suffered a physical injury (apparently the pleural thickening), but that Herber had suffered no loss for which compensation should be paid. Specifically, the jury found that the plaintiff had experienced an "injury to his lungs," that exposure to appellees' "asbestos containing products" was the proximate cause of plaintiff's injury, and that the "sum of money [that] would fairly, reasonably, and adequately compensate plaintiff for injuries attributable to defendants' products" was "none." App. 105-6. The trial court entered a judgment in favor of appellant in the amount of zero dollars. This timely appeal followed.
 
 II. THE FUTURE CANCER CLAIM
 
 5
 Under Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), we are required to apply the law of the state in which the district court sat. When the state law is unclear, we are required to predict what the state's highest court would rule. Commission v. Estate of Bosch, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967). Decisions of lower state courts are not controlling upon us but we acknowledge their expertise in analyzing the law of their state and give appropriate deference. Id.; First National State Bank of New Jersey v. Cm. Fed. Savings & Loan Ass'n of Norristown, 610 F.2d 164, 172 (3d Cir.1979).
 
 
 6
 Noting that Mr. Herber had proffered no expert opinion or other evidence that would permit a factual finding that he will more likely than not experience cancer in the future, the district court held that New Jersey law does not provide compensation for an increased risk of a future injury that remains a possibility rather than a probability.[1] As a result, the district court refused to permit the existence of this element of alleged damage to be litigated. We hold that the court did not err in this regard.
 
 
 7
 New Jersey law clearly recognizes a cause of action for anticipated future harm. In Coll v. Sherry, 29 N.J. 166, 175, 148 A.2d 481, 486 (1959), the New Jersey Supreme Court set out the general rule that "[i]f the prospective consequences may, in reasonable probability be expected to flow from the past harm, plaintiff is entitled to be indemnified for them." The New Jersey Supreme Court has applied this rule to a claim for prospective cancer. In Lorenc v. Chemirad Corp., 37 N.J. 56, 76, 179 A.2d 401, 411 (1962), defendant's negligence caused plaintiff to burn his hand with a liquid of defendant's manufacture. Plaintiff sought compensation for the burn's effects, both present and future, including a probable malignancy. The New Jersey Supreme Court found no error in the trial court's instruction to the jury that "in order to make an award ... [as compensation for the malignancy, the jury] must find, by the greater weight of the believable evidence, that plaintiff has shown 'he will probably develop malignancy because of this injury.' " Id.
 
 
 8
 Herber has thus alleged an injury, a future cancer, cognizable under New Jersey law. However, he did not proffer evidence of a probable future cancer as required by both Lorenc and Coll. Recognizing this fact, Herber argues that he should nevertheless be compensated for the present increased risk of the future cancer attributable to appellees' asbestos. That is, Herber urges that he should be allowed to introduce evidence that, because of his exposure to asbestos, the chance that he will develop a cancer has significantly increased. This increase in risk, says Herber, is an element of the damage he has actually suffered and should be considered in the calculation of his damage award. In his view, he should thus receive an amount equal to the amount one having an asbestos-caused cancer would receive, proportionately reduced to reflect the probability that he will not contract cancer.
 
 
 9
 We view Herber's argument as fundamentally at odds with New Jersey's approach to compensable injury. Coll and Lorenc stand for the proposition that a future injury, to be compensable, must be shown to be a reasonable medical probability. The objective of this approach is not only to provide compensation for harm that is likely to occur but also to ensure that an award of damages is not made for an injury that probably will not be suffered. Since this is venerable and well settled New Jersey policy, we are not disposed to predict a departure from this case law in the absence of signposts pointing clearly in that direction. We find none.
 
 
 10
 The New Jersey Supreme Court has expressly reserved decision on the issue of "[w]hether 'increased risk,' standing alone, is an actionable element of damage ...," Evers v. Dollinger, 95 N.J. 399, 412 n. 7, 471 A.2d 405, 412 n. 7 (1984), and we have been referred to no opinion of that Court which suggests to us that it is prepared to recognize increased risk as an independent injury. Nor has Herber's argument found favor in the lower courts of New Jersey. We have found no reported opinion endorsing it and there are two well-reasoned opinions rejecting it. Devlin v. Johns-Manville Corp., 202 N.J.Super. 556, 495 A.2d 495 (Law Div.1985); Ayers v. Jackson Twp., 189 N.J.Super. 561, 461 A.2d 184 (Law Div.1983), vacated on other grounds, 202 N.J.Super. 106, 493 A.2d 1314 (App.Div.1985).
 
 
 11
 In addition to the absence of supporting authority, we perceive no practical or policy grounds which might move the New Jersey Supreme Court to fashion new doctrine in this area. As both the Ayers and Devlin courts noted, for example, New Jersey recognizes cancer as an injury separate and distinct from asbestosis and, accordingly, recognizes a cause of action for cancer which does not accrue until one has discovered, or should have discovered, that one has such an injury. See Ross v. Johns-Manville Corp., 766 F.2d 823 (3d Cir.1985) (discussing New Jersey law). Thus, in New Jersey, Mr. Herber and others similarly situated run no risk that judicial relief will be unavailable should they hereafter contract cancer.
 
 
 12
 Herber finds in New Jersey Supreme Court's recognition of a "lost chance" cause of action in Evers v. Dollinger, supra, some intimation that it might be willing to embrace recovery for increased risk. We, however, find no such intimation.
 
 
 13
 Under the lost chance doctrine, a plaintiff can recover for damage suffered as the result of nonfeasance that reduced the probability of avoiding an injury actually sustained. Hake v. Manchester Township, 98 N.J. 302, 309, 486 A.2d 836, 839 (1985); Evers, 471 A.2d at 415. The degree of causation required under the lost chance doctrine is lower than that traditionally required. Rather than requiring "but for" causation, the lost chance doctrine requires only a showing that the defendant's negligence was a "substantial factor" in the causation of the injury. Thus, where a physician negligently fails to diagnose breast cancer that subsequent to his nonfeasance becomes malignant, New Jersey law permits the plaintiff to recover upon showing that the physician's failure was a "substantial factor" in the development of the malignancy. Evers, 471 A.2d at 413 (quoting Hamil v. Bashline, 481 Pa. 256, 269, 392 A.2d 1280, 1286 (1978)). See also Jones v. Montefiore Hosp., 494 Pa. 410, 431 A.2d 920 (1981); Gradel v. Inouye, 491 Pa. 534, 544-545, 421 A.2d 674, 679 (1980). This doctrine has been endorsed by the Restatement (Second) of Torts.[2]
 
 
 14
 But the change in the degree of causation accompanying the adoption of the lost chance doctrine does not imply a change in New Jersey's view of cognizable injury. Moreover, the lost chance rule only applies to injuries already incurred. Evers, 471 A.2d at 413. Appellant's reliance on the Evers case is thus inappropriate.
 
 III. THE MEDICAL SURVEILLANCE CLAIM
 
 15
 A consequence of the district court's holding that evidence of Herber's increased risk of a future cancer was not admissible was that his claim for the future cost of monitoring for cancer did not go to the jury. The court was willing to tolerate this result because it found the mere "mention of that dread disease" would be unduly prejudicial under Federal Rule of Evidence 403.[3] App. 87. We find that the trial court's assessment of the probative value of the proffered evidence and of the potential for unfair prejudice was sufficiently wide of the mark to constitute an abuse of discretion.
 
 
 16
 New Jersey recognizes the cost of preventative monitoring occasioned by a tort as an independent element of damages. Evers, 471 A.2d at 412; Coll, 148 A.2d at 486 ("If the prospective consequences may, in reasonable probability, be expected to flow from the past harm, plaintiff is entitled to be indemnified for them."). It is, of course, impossible to demonstrate that greater than normal monitoring for cancer will be necessary in the future without presenting evidence that the plaintiff has a greater than average risk of contracting cancer. For this reason, Herber's evidence of increased risk is highly probative. On the other hand, while we acknowledge that there may be some danger that a jury will overreact to evidence of increased risk of cancer, we have more confidence than did the trial judge in the ability of juries to deal appropriately with such evidence under the guidance of the court. In any event, the probative value of such evidence is so great that it could not properly be excluded under Rule 403.
 
 IV. THE EMOTIONAL DISTRESS CLAIM
 
 17
 The district court ruled that appellant could not present to the jury evidence of the emotional anguish he has allegedly suffered as a result of his fear of cancer. This ruling was based on the view that New Jersey law did not permit recovery for such distress absent evidence that it has resulted in physical injury or sickness. In reaching this conclusion, the district court relied upon a decision of the New Jersey Superior Court which states that "... proof of substantial bodily injury or sickness as a result of the emotional trauma remains as an essential element of proof." Ayers 461 A.2d at 189. We conclude that the Ayers case is inapposite in the situation before us and that the trial court erred in refusing to entertain Herber's claim for emotional distress.
 
 
 18
 In Evers, 471 A.2d 405, the Supreme Court of New Jersey expressly recognized a claim for emotional harm based on a fear of future cancer. In this malpractice action, the defendant physician had negligently failed to diagnose and treat a cancer in the plaintiff's breast that ultimately had to be removed in a radical mastectomy. The plaintiff had been prepared to show in the trial court that "she suffered anxiety, emotional anguish and mental distress" resulting in part "from the realization, following the confirmation of her malignancy, that defendant's delay in her treatment had increased the risk that she would again fall victim, perhaps fatally, to the disease." Evers, 471 A.2d at 409. The Supreme Court held that this was a viable claim:
 
 
 19
 On retrial plaintiff should be permitted to present her claims based on mental and emotional injury. Certainly compensable injury in the form of mental pain and suffering in a context of medical malpractice is not new. West v. Underwood, 132 N.J.L. 325, 40 A.2d 610 (E. & A.1945). Damages for Mrs. Evers' emotional and mental suffering should be awarded upon proof that this distress resulted from defendant's negligent failure to diagnose her tumor and effectuate prompt and proper treatment. See id. at 326, 40 A.2d 610. "[C]ourts have come to recognize that mental and emotional distress is just as 'real' as physical pain, and that its valuation is no more difficult." Berman v. Allan, 80 N.J. 421, 433, 404 A.2d 8 (1979); see Schroeder v. Perkel, 87 N.J. 53, 432 A.2d 834 (1981). Such distress could well encompass concerns over the anticipated future consequences of malpractice. See, e.g., Carter v. Public Serv. Coord. Transp., 47 N.J.Super. 379, 136 A.2d 15 (App.Div.1957) (plaintiff entitled to damages for personal injuries including anxiety and worry over possible injuries to her unborn child as the result of her own physical injuries when she fell while attempting to climb steps to board a bus, even though her baby was born normal and healthy three weeks later); Friel v. Vineland Obstetrical & Gynecological Ass'n, 166 N.J.Super. 579, 400 A.2d 147 (Law Div.1979) (awarded damages to a mother for the mental distress over possible brain damage to her child as well as damages to the mother for her own physical injuries proximately resulting from defendant's malpractice in causing plaintiff's child to be prematurely delivered, despite the fact that the harm of brain damage to the child would remain speculative for three to five years).
 
 
 20
 Evers, 471 A.2d at 411.
 
 
 21
 It is true, as appellees stress, that the plaintiff in Evers filed interrogatories indicating that the "mental distress subsequent to her mastectomy manifested in insomnia, weight gain and fatigue" as well as in "dermatological problems." Id. As we read the opinion, however, these facts played no role in the reasoning of the Evers Court. It referred to these interrogatories only in the course of demonstrating that a claim for emotional distress had in fact been asserted in the trial court. Id. n. 5.
 
 
 22
 In Devlin v. Johns-Manville Corp., 202 N.J.Super. 556, 495 A.2d 495 (Law Div.1985), the court read the Evers opinion as we do. The plaintiff in Devlin had been extensively exposed to the defendants' asbestos products. Like Mr. Herber, he sought damages for the enhanced risk of cancer, for future medical surveillance, and for emotional distress caused by fear of cancer. The court ruled out recovery for the enhanced risk but sanctioned recovery for the other two elements of damage. It found Evers dispositive of the emotional distress issue.
 
 
 23
 The defendants in Devlin, like the district court in this case, relied heavily on the Ayers case. We find the Devlin court's distinction between our situation and that before the court in Ayers to be persuasive:
 
 
 24
 The recent case of Ayers v. Jackson Twp., 189 N.J.Super. 561, 461 A.2d 184 (Law Div.1983) in which plaintiffs were denied recovery for their fear of future cancer is clearly distinguishable from the case at bar. None of the plaintiffs in Ayers were presently suffering from physical illness as a result of their ingestion of pollutants. The experts in that case conceded that there was no way to ascertain if any of the plaintiffs would in fact ever suffer from any illness in the future. The emotional injury of which plaintiffs in this case complain stems from the substantial bodily harm they have already suffered as a result of ingesting asbestos over an extended period of time. In this case there has been "[i]mmediate and direct physical impact and injury" which was non existent in factual situations presented in Ayers. Id. at 571, 461 A.2d 184.
 
 
 25
 Devlin, 495 A.2d at 499.
 
 
 26
 In New Jersey, as in most states, the law of damages in cases involving no physical impact and injury has had a development largely independent of the law of damages in physical impact and injury cases. While there are signs of a possible confluence and there has been some recent movement in the New Jersey law governing situations like the one in Ayers[4], we believe the New Jersey law in physical impact and injury cases is well settled. Because the jury in this case found that exposure to the defendants' asbestos had caused pleural thickening, we are confident that the Supreme Court of New Jersey would treat Mr. Herber's emotional distress claim no differently than a pain and suffering claim in a slip and fall case. While the appellees' intimate that the infiltration of Mr. Herber's lungs may be characterized as involving little impact and the pleural thickening as involving insubstantial injury, only slight impact and injury have been found by the New Jersey courts to warrant recovery for emotional distress caused by fear. See, e.g., Porter v. Delaware L. & W.R.R. Co., 73 N.J.L. 405, 63 A. 860 (1906) (plaintiff hit by dust and light debris from falling bridge entitled to recover in claim for fright).
 
 
 27
 In short, Herber's failure to proffer evidence of a consequential physical manifestation of his fear of cancer does not mean that he has no compensable claim for emotional distress under New Jersey law.[5] The district court therefore erred in holding otherwise.
 
 
 28
 The district court held, in the alternative, that evidence of fear of cancer was unduly prejudicial and would be excludable under Rule of Evidence 403. Since barring mention of the future harm that a plaintiff presently fears effectively precludes proof of a claim based on that fear, we hold that the court's ruling under Rule 403 was abusive of discretion. We believe a properly instructed jury can responsibly distinguish between a claim for a future cancer and a claim for present anxiety about a possible future cancer.
 
 V. THE FURTHER PROCEEDINGS
 
 29
 It follows that the judgment below must be vacated and that this case must be returned to the trial court for further proceedings. It does not follow, however, that those proceedings must involve a retrial of all of the issues in the case. The errors we perceive in the trial record relate solely to issues that should have been submitted to the jury and were not, and we see no reason why the jury's resolutions of the issues which were tried should not stand. Accordingly, this case will be remanded for a new trial directed to the issues of (1) whether Mr. Herber has or will experience emotional distress related to fear of cancer, (2) whether he will incur future medical expense associated with monitoring for cancer, and (3) if either or both of these injuries are more likely than not, what amount of money will provide him with fair compensation.
 
 
 30
 A. The Alleged Errors Relating to the Jury's Liability Determination
 
 
 31
 Eagle-Picher argues that the jury's decisions with respect to it on the liability issues cannot stand for two reasons. First, it claims that Plaintiff's Exhibit 11 was improperly admitted into evidence and that this error was prejudicial to it. Second, Eagle-Picher maintains that the court should have precluded the jury from apportioning liability among the defendants once it became known that the jury had assessed "zero" damages. We disagree on both points.
 
 
 32
 Herber testified on direct that he had seen bags of asbestos cement on the premises where he worked. He was then asked to describe what the containers of cement looked like. His response was the following:
 
 
 33
 A. It would remind you of a cement bag. It was, like, maybe 40 or 50 pounds, tan. It had black lettering, "Eagle-Picher," with small lettering underneath of it, "Asbestos Cement," and some of the bags had a picture of an eagle on it; some did and some didn't. (R. 386).
 
 
 34
 Herber went on to testify that he first saw such bags at his place of employment, the New York Shipyard, in 1958. He further stated that he was employed at that yard until 1967 and that he saw these bags every day while at that job. He also testified that he observed these bags while employed at the Philadelphia Naval Shipyard from 1967 until the time of trial.
 
 
 35
 At the outset of cross-examination by Eagle-Picher, Herber was questioned regarding the fact that he had appeared for a deposition prior to trial. He stated that he recalled that proceeding. He was then asked if he recalled being shown a group of photographs of insulation products by the attorney for Johns-Manville. Herber replied that he did remember that. He was then questioned in an effort to show that his deposition testimony regarding those photographs was inconsistent with his testimony at trial.[6]
 
 
 36
 On redirect, Herber was shown a piece of paper containing, among other things, a depiction of an eagle.[7] He testified that this was the same picture of an eagle which he had seen on the bags labeled Eagle-Picher Asbestos Cement, but that no one had shown him a similar picture during his deposition when he gave the allegedly contradictory testimony. The sheet of paper was admitted into evidence over Eagle-Picher's objections as P-11.
 
 
 37
 Eagle-Picher's primary argument is that P-11 was not properly authenticated. Rule 901(a) of the Federal Rules of Evidence provides that the requirement of authentication "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Subsection (b) provides, in part:
 
 
 38
 (b) Illustrations. By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:
 
 
 39
 (1) Testimony of witness with knowledge. Testimony that a matter is what it is claimed to be.
 
 
 40
 P-11 was offered by Herber as an accurate depiction of what he had seen on bags of asbestos cement at his place of work. Herber purported to have personal knowledge of what he had observed on the bags and his testimony clearly supported a finding that the depiction of the eagle in P-11 what was claimed for it. It was admitted and used solely for the purpose of demonstrating that the circumstances surrounding his deposition testimony were different from those surrounding his trial testimony.
 
 
 41
 In reality, Eagle-Picher's argument is not about a want of authentication but about an alleged insufficiency of the evidence. However, given Herber's testimony concerning bags of asbestos cement having a picture of an eagle over the words "Eagle-Picher", the jury was clearly entitled to infer that Herber had been exposed to the products of this defendant even in the absence of express evidence relating to its trademark and tradedress.[8]
 
 
 42
 Turning to Eagle-Picher's second point, at 4:45 P.M. on December 7, 1984, the jury advised the court that it had reached a verdict. Before permitting the foreperson to read the answers to the special interrogatories, the trial judge examined the answers. He then instructed the jurors to return to the jury room and advised counsel that the responses to the first five interrogatories were "Yes." The trial judge also told counsel that in response to interrogatory No. 6 the jury had written "None." At that juncture, the trial judge suggested that the jury be required to respond to the remaining interrogatories.
 
 
 43
 There were only two questions which remained unanswered. Those questions read:
 
 
 44
 7. If, in Question # 5, you answered "Yes" to more than one of the defendants listed, list the corresponding percentage of liability to be allocated but only as to those defendants. The total must equal 100 percent.
 
 
 45
 Eagle-Picher ____%
Pittsburg Corning ____%
Unarco ____%
 
 
 46
 8. Did defendants prove (and they have the burden on this issue) that plaintiff knew or should have known on or before July 6, 1978 that he had an asbestos related injury?
 
 Yes No
 
 47
 Over Eagle-Picher's objection, the judge sent the jury back to answer interrogatories 7 and 8. The jury ultimately assigned various percentages to the defendants that had been found to have caused injury to Herber and answered interrogatory 8 in the negative.[9]
 
 
 48
 Eagle-Picher points out that Federal Rule of Civil Procedure 49(b) authorizes only "written interrogatories upon one or more issues of fact the decision of which is necessary to a verdict ..." (emphasis supplied). It argues that, once it became known that "zero" damages had been assessed, interrogatory 7 was no longer necessary to a verdict. We conclude, however, that Rule 49(b) should be read as of the time a case is originally submitted to the jury. Any other reading would invite inefficient utilization of judicial resources and unnecessary litigation expense in violation of the dictates of Federal Rule of Civil Procedure 1. If, for example, the jury had decided that Herber knew, or should have known, about his injury more than two years before he filed suit, the post-trial proceedings and this appeal would have been substantially less complex. Moreover, as this case also illustrates, one cannot finally determine what written interrogatories will be necessary to a verdict until all proceedings, including any appellate proceedings, are concluded. As a result, we believe that the trial judge was well within the scope of her permissible discretion and, indeed, is to be commended.
 
 B. The Alleged Errors Relating to Damages
 
 49
 One of Mr. Herber's principal contentions on this appeal is that the trial judge erred in failing to grant a new trial on the issue of damages. He argues that a "zero" damage award was both per se contrary to law and against the weight of the evidence. We cannot agree.
 
 
 50
 While we have been referred to no New Jersey authority on the point, we are persuaded that the New Jersey Supreme Court would find that an award of zero damages is not inconsistent, as a matter of law, with a finding of conduct which would otherwise give rise to liability on the part of the defendants. See, e.g., Spears v. Hough, 458 F.2d 529 (8th Cir.1972) ("zero" damage award sustained where plaintiff struck by buck shot from negligently fired shotgun); Huntley v. Community School Board of Brooklyn, 579 F.2d 738 (2d Cir.1978); Joseph v. Rowlen, 425 F.2d 1010 (7th Cir.1970); Wright v. Hoover, 329 F.2d 72 (8th Cir.1964); Wingerter v. Maryland Casualty Co., 313 F.2d 754 (5th Cir.1963); Association of Western Railways v. Riss & Co., Inc., 299 F.2d 133 (D.C.Cir.1962); Poydock v. Adams Transfer and Storage Co., 51 F.Supp. 374 (W.D.Pa.1943).
 
 
 51
 Turning to the record in this case, we cannot say that the trial judge abused her discretion in failing to reject the jury's "zero" damage assessment. Herber had not missed a day of work and presented no evidence that he had received medical treatment. Moreover, Dr. Atkinson, one of his own expert witnesses, informed the jury that:
 
 
 52
 (1) Herber's physical examination revealed a well-developed, well-nourished male in no distress.
 
 
 53
 (2) There was no associated asthma or wheezing, and Herber, at the time of examination was not short of breath except with extreme exertion. He had no cough or sputum production.
 
 
 54
 (3) Herber was under no treatment and took no medication.
 
 
 55
 (4) The lung fields were clear upon percussion.
 
 
 56
 (5) Pulmonary function tests were "normal" or demonstrated minor abnormalities of the small airways which did not deviate enough from normal to be called abnormal.
 
 
 57
 Dr. Atkinson did report the presence of a pleural thickening which he characterized as a "marker" of asbestos exposure. Defendants' expert, Dr. Rodman, testified, however, as follows:
 
 
 58
 No. Pleural thickening, per se, is not a sickness. It is a scar, like a scar any place else on the body. It indicates that at some time in the past, the pleura has been stimulated or injured, like a surgical scar from an appendectomy, for instance.
 
 
 59
 Dr. Rodman further testified that pleural thickening was not asbestosis: "Asbestosis is a lung disease due to the inhalation of asbestos particles and it is characterized by fibrous tissue or scar tissue within the substance or parenchyma of the lung." (A. 550). Dr. Rodman stated that, in his opinion, "there is no evidence of any kind of parenchymal lung disease on Herber's x-rays, either asbestosis, or any kind of lung disease." (A. 551).
 
 
 60
 Herber's experts also provided testimony from which a jury could conclude that he would, more likely than not, experience a "partial disability" at some time in the future. Dr. Rodman countered, however, with the opinion that there was no reason to think Herber would become sick or disabled in any way in the future.[10]
 
 
 61
 In short, there was ample evidence from which the jury could have concluded that, despite his pleural thickening, Herber was presently healthy and likely to remain so in the foreseeable future. Accordingly, with respect to all elements of damage submitted to the jury and all elements properly excluded from the jury's consideration, we conclude that the zero damage assessment should stand.[11]
 
 
 62
 Only one other allegedly prejudicial error deserves comment.[12] Herber claims to have been prejudiced by the improper participation in the trial of a "Joint Medical Counsel" who represented the defendants with respect to the medical issues. We find no error.
 
 
 63
 With the district court's permission, Andrew Berry, Esquire, presented opening and closing statements restricted to the medical issues in the case, cross-examined plaintiff and plaintiff's expert witnesses on the medical issues, and presented an expert witness on behalf of the defendants. Other defense counsel restricted their openings, closings and cross-examination of plaintiff to issues of product identification and other non-medical areas. Plaintiff's counsel was not restricted in the length or substance of his opening or closing statement.
 
 
 64
 The concept of medical counsel originated in 1983 as a means of providing a more coordinated defense while saving costs in the asbestos litigation. The program designates one counsel to act as medical counsel in a given jurisdiction on behalf of all participating defendants. Any asbestos defendant may join the program in any or all states in which the program has been implemented. The designated medical counsel handles all medical aspects of the case, including obtaining medical records, deposing treating and examining physicians, arranging for physical or pathological examinations, preparing medical evaluations and reports and handling the medical aspects of the trial. We are told that, in New Jersey, twenty-eight defendants are participating in the medical counsel program.
 
 
 65
 As plaintiff acknowledges, the medical counsel program provides some benefits for plaintiffs. It limits the number of authorizations a plaintiff must sign, the number of examinations to which he or she must submit, the number of times he or she can be cross-examined on the same subject, etc. The benefit to plaintiff's counsel is that he need only deal with one firm in scheduling examinations, medical depositions, the transfer of pathological material, etc. Similar benefits accrue to the courts which manage the asbestos litigation.
 
 
 66
 In view of the benefits afforded to plaintiffs and defendants, as well as to the court, by the medical counsel program, and in view of the broad discretion of the trial judge in decisions regarding the format of the trial, the district court did not abuse its discretion when it permitted medical counsel to present the medical defense in this case. We encourage such coordination in asbestos litigation.
 
 C. The Scope of Further Proceedings
 
 67
 The new trial should thus focus on whether Herber suffers from emotional distress caused by exposure to the defendants' products and whether he requires medical monitoring for signs of cancer as a result of that exposure. The jury should be specifically instructed that the prior jury's findings with respect to Herber's exposure to defendants' products, the fact of injury to Herber's lungs, proximate cause, and any other relevant subject covered by Special Interrogatories 1 through 8 are now the law of case and must be accepted as true.
 
 
 68
 The judgment of the district court is, accordingly, vacated and the case remanded for further proceedings consistent with this opinion.
 
 
 
 [1]
 The record is not clear on precisely what plaintiff's expert would have said if permitted to testify but it does reveal that he had no epidemiological data showing a class risk in excess of 50% and was not prepared to offer an opinion that Herber, more likely than not, would experience cancer. Given this record on the evidence the plaintiff did not have, this case does not present the issue of whether and when an epidemiological study might be admissible in support of the claim of an individual plaintiff for future cancer
 
 
 [2]
 See Section 323 of the Restatement (Second) of Torts:
 One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
 (a) his failure to exercise such care increases the risk of such harm, or
 (b) the harm is suffered because of the other's reliance upon the undertaking.
 
 
 [3]
 Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, of needless presentation of cumulative evidence."
 
 
 [4]
 New Jersey law has moved from rejection of a cause of action for the physical consequences of fear, Ward v. N.J. & Seashore R.R. Co., 65 N.J.L. 383, 47 A. 561 (1900), to an acceptance of compensation for the physical damage caused by emotional trauma, Falzone v. Busch, 45 N.J. 559, 214 A.2d 12 (1965), to a recognition of the emotional harm itself as a distinct injury, Portee v. Jaffee, 84 N.J. 88, 417 A.2d 521 (1980); Berman v. Allan, 80 N.J. 421, 404 A.2d 8 (1979)
 
 
 [5]
 Defendants suggest that the view here expressed will contribute to the growing crises of skyrocketing liability awards. This is a legitimate concern. However, based upon the reaction of the Supreme Court of New Jersey when confronted with similar arguments, we do not believe that this concern would deter that Court from embracing the view here expressed. See Falzone v. Busch, 45 N.J. 559, 214 A.2d 12, 16 (1965)
 
 
 [6]
 Q. And nothing has happened between then and now to change your mind about the fact that you never read the bags, the writing on the bags of the Eagle-Picher cement. Isn't that correct?
 A. As I said before, I saw the name Eagle-Picher. I never picked the bag up and read it.
 Q. And in fact, you never saw an eagle on the bag; did you?
 A. I still say I saw an eagle on some of the bags and some of the bags didn't have eagles on them. That is--
 Q. But you don't know whether or not they were Eagle-Picher cement bags; do you?
 A. The picture I saw the eagle was on an Eagle-Picher bag.
 Q. You didn't tell us that on May 7, 1981, did you?
 A. I guess I didn't think of it.
 Q. Well, in fact, you did think of it and you changed your mind during the course of the deposition; didn't you?
 A. I don't think I changed my mind. You showed me pictures of bags without eagles on them, and I said it sticks out in my mind that I saw an eagle on a bag. Now, the pictures you showed me didn't have eagles on them.
 Q. Mr. Herber, if you never read the bag of Eagle-Picher cement, as you testified to at your deposition, other than to see the name Eagle-Picher cement--
 A. Correct.
 Q. --then how do you come to the conclusion that that particular Eagle-Picher cement product contained any asbestos?
 A. Because it had block lettering, black, block letters, "Eagle-Picher" on the bag, and underneath in small letters, it said, "Asbestos cement."
 (R 432-433).
 
 
 [7]
 The paper had apparently been attached to Eagle-Picher's answers to interrogatories in a Maryland asbestosis case
 
 
 [8]
 We are similarly unpersuaded that the trial court abused its discretion in permitting the admission of P-11 as rebuttal evidence despite the fact that it was not listed as a plaintiff's exhibit in the pretrial order
 
 
 [9]
 Herber also challenges the Court's ruling concerning interrogatory 7. His claim is that the court erred in allowing the jury to make an apportionment of liability which assigned a percentage share to a defendant which did not participate in the trial because of a stay under the bankruptcy law. We see no harm to Herber, however, since he is entitled to a molded verdict under the New Jersey Comparative Negligence Act, 2A N.J.Stat.Ann. Sec. 15-5.3 (West 1982)
 
 
 [10]
 Plaintiff also assigns as error the trial court's failure to permit the jury to return an award for future lost wages. The trial judge held that there was insufficient evidence in the record to support such an award. While Herber has referred us to nothing which would permit the jury to quantify future lost wages, we need not rest our rejection of this argument on that ground. While the judge refused to charge specifically on future lost wages, she did instruct the jury to compensate Herber for any present or future "disability" which they concluded, "in reasonable probability" he had or would experience as a result of exposure to the defendants' products. We think it clear from the jury's zero damage assessment, that it either was unpersuaded by Herber's evidence or credited the defendants' evidence
 
 
 [11]
 Herber also asserts that a note delivered to the judge with the jury's answers to interrogatories demonstrates that the jury did not understand and follow the court's instructions. This note from the foreperson purported to explain how the jury had reasoned to its "zero" damage assessment and is not competent evidence under Fed.R.Evid. 606(b). Cf. Domeracki v. Humble Oil & Refining Co., 443 F.2d 1245 (3d Cir.1971). Moreover, we do not regard the note as inconsistent with the hypothesis that the jury understood and followed the trial court's instruction
 
 
 [12]
 The three evidentiary rulings attacked by Herber were well within the scope of permissible discretion as was the failure to specifically charge that this would be Herber's only opportunity to recover for asbestosis