627 A.2d 135

MARY ANN CAMPO AND FRANCIS CAMPO, HER HUSBAND, PLAINTIFFS–APPELLANTS, v. DR. ALBERT TAMA, DEFEN-DANT–RESPONDENT, AND GARDEN STATE COMMUNITY HOSPITAL, CPH RADIOLOGIC ASSOCIATES, AND DR. WILLIAM ROSNER, DEFENDANTS.

Argued January 20, 1993—Decided July 22, 1993.

*Philip L. Blackman* argued the cause for appellant (*Schwartz & Blackman,* attorneys).

*Stacy L. Moore, Jr.,* argued the cause for respondent (*Parker, McCay & Criscuolo,* attorneys; *Mary Ann C. O'Brien,* on the brief).

The opinion of the Court was delivered by

POLLOCK, J.

In this medical-malpractice action, the jury found that defendant Dr. Albert Tama had not been negligent in failing to diagnose breast cancer in plaintiff Mary Ann Campo. The appeal questions whether the trial court committed reversible error in not allowing plaintiff to prove estimated medical expenses that she might incur were she to suffer a recurrence of cancer. Also raised is the propriety of a jury instruction that if plaintiff were to suffer a recurrence, she could maintain a subsequent action. In an unreported opinion, the Appellate Division affirmed a judgment for defendant. We granted plaintiffs' petition for certification, 130 *N.J.* 19, 611 *A.*2d 656 (1992), and now affirm.

–I–

In March 1985, Mrs. Campo, who was in her mid-forties, called Dr. Tama to report that she had found a lump in her left breast. In 1974, 1977, and 1980, Dr. Tama had discovered in Mrs. Campo's breasts three benign lumps, which were surgically removed.

Based on the presence of those lumps, Dr. Tama had diagnosed Mrs. Campo as suffering from fibrocystic breast disease, a nonspecific diagnosis for a condition involving palpable lumps in the breasts, usually accompanied by pain and tenderness.

On the same day that Mrs. Campo called, Dr. Tama examined her. He noted that an area above her left nipple was tender and "shotty," meaning that he could feel small nodules that felt like buckshot. Although he could not feel a lump, he asked her to report to Garden State Community Hospital for a mammogram, an x-ray that can reveal masses and malignancies.

At the hospital Dr. William Rosner reviewed the mammogram and examined Mrs. Campo. Dr. Rosner agreed with Dr. Tama's diagnosis that the nodules were a manifestation of fibrocystic disease.

Dr. Rosner's report to Dr. Tama indicated the presence of bilateral microcalcifications, meaning that in both breasts microscopic areas of soft tissue had hardened because of accumulations of calcium salts. Dr. Tama's secretary told Mrs. Campo that all was "fine." According to Mrs. Campo, when Dr. Tama later called, he added that "[t]here was nothing to worry about." He told her that he would see her in six months, at her next regularly-scheduled appointment.

Mrs. Campo returned to Dr. Tama in October 1985. She reported no new symptoms, but repeated that she could feel a lump in her left breast beneath a tender area. Dr. Tama conducted a routine examination, and again was unable to palpate a distinct mass. He instructed her to return in six months.

In March 1986, during her regularly-scheduled examination, Mrs. Campo told Dr. Tama that the area was now so tender that she could not lie on her stomach. She also stated that the lump felt larger. Dr. Tama noted an induration or hardening of the area above the nipple on her left breast, but he still was unable to palpate a distinct lump. Because of the induration, he referred Mrs. Campo to the Medical Imaging Center at Greentree for another mammogram, which revealed two masses, one measuring

one centimeter and the other 1.5 centimeters. Dr. Tama informed Mrs. Campo that the x-ray report indicated that a section of her breast should be biopsied. He referred her to a surgeon, Dr. Rudolph Camishion, who examined Mrs. Campo and palpated a three-centimeter firm mass in her left breast.

On May 12, in an out-patient procedure, Dr. Camishion removed a section of tissue from Mrs. Campo's left breast. While she was in the recovery room, he told her that "it did not look good" and that she should return the next day. On that day he told her that the biopsy established that the tumor was malignant. He recommended a mastectomy, an excision of the breast. According to Mrs. Campo, Dr. Camishion told her that the tumor had been cancerous from its inception in 1985.

Mrs. Campo immediately obtained a second opinion from Dr. Gordon Schwartz, who, after examining the 1985 and 1986 mammograms and the biopsy results, confirmed Dr. Camishion's diagnosis. According to Mrs. Campo, Dr. Schwartz also told her that the 1985 mammogram "didn't take" and was illegible. Soon thereafter, Dr. Tama called Mrs. Campo to ascertain the results of her visit to Dr. Camishion. When Mrs. Campo asked Dr. Tama about the poor quality of the x-rays, he responded that he had not seen the 1985 x-rays, but had relied on Dr. Rosner's report.

On June 3, 1986, Mrs. Campo underwent a modified radical mastectomy, during which Dr. Schwartz removed her left breast, the underlying muscle, and the lymph nodes under her left arm. Because the cancer had metastasized to one lymph node, Mrs. Campo also underwent six months of chemotherapy. Additionally, she had a series of reconstructive surgeries. Fortunately, she has not experienced any recurrence of cancer in the intervening seven years.

On April 8, 1987, Mrs. Campo and her husband, Francis Campo (plaintiffs), sued Dr. Tama, Garden State Community Hospital, Dr. Rosner, and his medical group, CPH Radiologic Associates. Before trial, the court granted the hospital's motion for summary judgment.

At trial, plaintiffs presented one expert, Dr. Donna Glover, an oncologist. She testified that Mrs. Campo's fibrocystic disease put her at a three-times-greater-than-average risk of developing cancer. According to Dr. Glover, microcalcifications are associated with malignancy in twenty to fifty percent of relevant cases. Because of the presence of microcalcifications and Mrs. Campo's high risk of cancer, Dr. Glover believed that in March 1985 Dr. Tama should have either needle-aspirated the nodules, performed an ultrasound, referred Mrs. Campo to a surgeon, or seen her more frequently. Dr. Glover also testified that the quality of the 1985 mammogram was poor. Plaintiffs, however, presented no expert testimony that either the x-ray or Dr. Rosner's report was so deficient as to constitute a breach of a duty owed to Mrs. Campo. Consequently, at the conclusion of plaintiffs' case, the court granted motions to dismiss by Dr. Rosner and CPH Radiologic Associates.

On behalf of Dr. Tama, Dr. Michael Mastrangelo, an oncologist, disputed the claim that Mrs. Campo was at a higher risk of developing breast cancer because she had a fibrocystic disease. He testified that there are various sorts of fibrocystic disease and that only those that show atypical hyperplasia, the excessive proliferation of irregular cells, are associated with a higher-than-average risk. The pre–1986 biopsies from Mrs. Campo's breast, he stated, did not indicate any such proliferation. Dr. Mastrangelo also testified that although microcalcifications may sometimes indicate cancer, a doctor should also consider other risk factors, such as the age of the patient and the family history of breast cancer. His review of the medical records indicated that Mrs. Campo had not exhibited any risk factors. He concluded that Dr. Tama had conformed with accepted medical standards in requiring only that Mrs. Campo return at six-month intervals.

Dr. Richard L. Berman, a gynecologist, concurred with Dr. Mastrangelo that only follow-up examinations were indicated. The presence of microcalcifications in both of Mrs. Campo's breasts, he stated, was consistent with fibrocystic disease. He

also testified that it was standard practice for gynecologists to rely on radiologists' reports, and not themselves look at mammograms.

After the jury found that Dr. Tama had not been negligent, the court entered a judgment of no cause of action.

–II–

Plaintiffs contend two trial errors require reversal of the judgment. First, they contend that the trial court mistakenly refused to allow them to present evidence relating to medical expenses Mrs. Campo might incur should she suffer a recurrence of cancer. Although they did not so argue before the trial court, they now rely on the rule that if a plaintiff is more likely than not to incur a future medical expense, he or she may recover at present. *Coll v. Sherry*, 29 *N.J.* 166, 148 *A.*2d 481 (1959). Their second contention is that the court erred by instructing the jury that if in the future Mrs. Campo were to develop cancer, she could then claim resulting damages.

█ Plaintiffs correctly assert that the trial court should have instructed the jury that Mrs. Campo could recover for future medical expenses if she could show that she would probably incur those expenses. In *Coll, supra*, we held that the trial court had erred in not allowing plaintiff's expert to testify regarding expenses related to a future operation to correct plaintiff's present injury. 29 *N.J.* at 174, 148 *A.*2d 481. Underlying that holding was our attempt to accommodate the inability to foresee the future and the desire to avoid successive actions for personal injuries. *Ibid.* We struck the accommodation by allowing the plaintiff to recover for an operation that the plaintiff would probably require. *Id.* at 175, 148 *A.*2d 481; *see also Lorenc v. Chemirad Corp.*, 37 *N.J.* 56, 76, 179 *A.*2d 401 (1962) (permitting jury to consider testimony regarding plaintiff's fear of future cancer because his expert testified that malignancy was probable). Finding that the operation was reasonably probable, we held that the trial court should have permitted proof of costs of the operation and the

extent of any resulting disability. *Coll, supra,* 29 *N.J.* at 173–74, 148 *A.*2d 481.

More recently, we held that a high probability that the plaintiff was at an increased risk of contracting cancer would not support a claim for that risk in the absence of proof that the plaintiff would more likely than not contract cancer. *Mauro v. Raymark Indus.,* 116 *N.J.* 126, 561 *A.*2d 257 (1989). In *Mauro,* we affirmed both the trial court's exclusion of statistical evidence correlating asbestos disease with cancer and its rejection of the plaintiff's claim that exposure to asbestos had increased the risk that he would contract cancer. *Id.* at 128, 561 *A.*2d 257. Because the plaintiff's expert could not testify that the plaintiff would probably contract cancer, we declined to recognize the claim for damages that would result should the plaintiff contract cancer. *Id.* at 128, 132–36, 561 *A.*2d 257; *see also Ayers v. Township of Jackson,* 106 *N.J.* 557, 525 *A.*2d 287 (1987) (reaching same result under New Jersey Tort Claims Act). We said that the claim could be asserted if and when the disease occurred. Neither the statute-of-limitations nor the single-controversy doctrine would preclude the claim. *Mauro, supra,* 116 *N.J.* at 143–44, 561 *A.*2d 257; *see also Ayers, supra,* 106 *N.J.* at 583, 525 *A.*2d 287 (stating that "neither the single controversy doctrine nor the statute of limitations, *N.J.S.A.* 2A:14–2, will preclude a timely-filed cause of action for damages prompted by the future 'discovery' of a disease or injury related to the tortious conduct. . . .").

When addressing Mrs. Campo's claim for damages, Dr. Glover testified that if Dr. Tama had diagnosed Mrs. Campo's cancer in 1985 when she first complained of the mass and tenderness, her chance of complete cure would have been between seventy-five and one-hundred percent. According to Dr. Glover, the twelve-month delay had reduced Mrs. Campo's chances to approximately thirty to fifty percent. Dr. Glover's testimony was that because of the delay, Mrs. Campo had a fifty- to seventy-five-percent chance of suffering a recurrence of cancer.

When plaintiffs' counsel sought to elicit Dr. Glover's opinion regarding the medical costs associated with a recurrence of cancer, defense counsel objected, stating that any such testimony would be speculative. Plaintiffs' counsel responded that the single-controversy doctrine would forbid plaintiffs from bringing a future action for future injuries. The court indicated that if the injury recurred, plaintiff could then sue, but agreed to hold a *Rule* 8 hearing to determine the nature of Dr. Glover's testimony.

During the hearing, Dr. Glover iterated that the year delay in diagnosing Mrs. Campo's cancer had made it more likely than not Mrs. Campo would suffer a recurrence of cancer. Dr. Glover testified further that if Mrs. Campo suffered a recurrence, she would die within a few years. According to Dr. Glover, "care for a year could certainly amount to $100,000," with the total damages depending "on how long the patient lives."

The trial court noted that "[t]here is a higher degree of probability that [the cancer] will recur." It determined, however, that because "[t]here is no assurance in this instance that the plaintiff would not or could not fall into that category of persons with whom the recurrence did not occur," "it would be more prudent under all of the circumstances to follow what has been established in the asbestos cases." The reference to "asbestos cases" is to the *Ayers/Mauro* Rule that a plaintiff may not recover for future injuries until they occur. The trial court ruled, therefore, that plaintiff could not recover for probable future harm, but would have to institute a second action should the harm occur. That ruling was error.

Dr. Glover had testified that because of the delay in diagnosis, Mrs. Campo would probably suffer a recurrence of cancer. That testimony entitled Mrs. Campo to a jury determination on the probability of a recurrence and future medical costs. If future damage is reasonably probable, plaintiffs may recover for it at present. *Lorenc, supra,* 37 *N.J.* at 76–77, 179 *A.*2d 401; *Coll, supra,* 29 *N.J.* at 174–75, 148 *A.*2d 481. The trial court should have allowed Dr. Glover to testify before the jury regarding her

estimate of the costs that would occur if Mrs. Campo were to suffer a recurrence of cancer.

–III–

The error, however, was harmless. Under *Rule* 2:10–2, a reviewing court should reverse only if a trial error is clearly capable of producing an unjust result.

■ The trial court permitted Dr. Glover to testify regarding Mrs. Campo's increased risk of harm. Dr. Glover testified that because of Dr. Tama's alleged failure to diagnose Mrs. Campo's cancer in 1985, Mrs. Campo was more likely than not to suffer a recurrence. Not allowed was Dr. Glover's offer to testify regarding the monetary damages that Mrs. Campo would incur if she should suffer a recurrence. Because the jury found that Dr. Tama had not breached any duty of care owed to Mrs. Campo, the damages that she might recover if the jury had found otherwise are irrelevant.

■ We also find harmless the trial court's instructions that plaintiffs could maintain a second action if Mrs. Campo's cancer were to recur. Plaintiffs argue that the erroneous instruction left the jury with the impression that plaintiff could relitigate Dr. Tama's liability. They assert that if the jury believed that plaintiffs could recover in the future, it might have been less willing to find Dr. Tama negligent, on the assumption that if the cancer were, to recur, a jury at that time could reconsider Dr. Tama's liability. See *Joy v. Barget,* 215 *N.J.Super.* 268, 272, 521 *A.*2d 906 (App.Div. 1987) (holding that suggestion plaintiff had recourse to workers' compensation "may have deflected the jury from appropriate consideration of the issues before it"); *La Rocca v. Ench,* 35 *N.J.Super.* 53, 56, 113 *A.*2d 66 (App.Div.1955) (holding that "it is prejudicial to indicate to the jury that the plaintiff has or may have another remedy ...". The trial court, however, squarely instructed the jury that its determination of negligence would be binding in all future actions. Plaintiffs' counsel excepted to the charge because he mistakenly thought that the court had not told

the jury that if it found Dr. Tama was not negligent, Mrs. Campo could not recover even if she were to suffer a recurrence. Defense counsel correctly responded that the court had instructed the jury that its verdict on negligence would be binding in any future action. Continuing, defense counsel excepted to the charge on the ground that it would make the jury more likely to find Dr. Tama negligent. We have no doubt that the jury understood that its verdict on negligence would bind the parties in any future action and that the court's instructions did not affect the verdict that Dr. Tama had not been negligent.

■ The dissent concludes that we should override that verdict. To reach that conclusion, the dissent commits several errors. First, it fails to accept the jury finding that Dr. Tama had not breached any duty of care owed to Mrs. Campo. Hence, the dissent dissembles by describing the jury's role in this case as "evaluating a physician's conduct to see whether it had contributed to cause an otherwise-preventable spread of cancer." *Post* at 136, 627 *A.*2d at 142. As indicated, the jury's primary role was to decide if Dr. Tama had breached a duty of care. Having found that he had not, the jury had no reason to consider whether Dr. Tama's conduct had contributed to the spread of Mrs. Campo's cancer. By failing to recognize that the dispositive issue is whether Dr. Tama had been negligent, the dissent speculates that the jury was required "to evaluate the extent to which Dr. Tama's failure promptly to order a biopsy or aspiration of the breast mass in 1985 might have contributed to the spread of plaintiff's cancer." *Post* at 137, 627 *A.*2d at 142. Contrary to the dissent, because the jury found that Dr. Tama had not been negligent in treating Mrs. Campo, it properly did not reach the issue whether the alleged negligence "might have contributed to the spread of plaintiff's cancer." *Ibid.* As an abstract proposition, we agree with the dissent's observation that "[m]ost patients expect, however, that physicians will not fall short of acceptable medical standards in treating them." *Post* at 141, 627 *A.*2d at 144. Because the jury found that Dr. Tama had not been negligent, however, that observation is irrelevant.

Invalid also is the dissent's argument, not previously raised at trial or on appeal, that the trial court should have told the jury when it was evaluating Dr. Tama's conduct to consider Dr. Glover's testimony about the increased risk of recurrence. Mrs. Campo offered that testimony to prove only the monetary loss she would sustain, not to prove that Dr. Tama should have been more careful. At trial, neither Mrs. Campo's counsel nor her expert contended that Dr. Tama should have been more careful because of the increased risk of recurrence. Thus, the increased risk of recurrence relates not to any alleged breach of duty but to causation or damages. More important, Dr. Glover testified that Mrs. Campo was at an increased risk of recurrence. As the dissent concedes, "the trial court had permitted Dr. Glover to testify in front of the jury that Mrs. Campo's life expectancy would be shortened and that if the recurrence developed, which was medically probable, she would die within a few years after the recurrence." *Post* at 139, 627 *A*.2d at 143. Having heard that testimony, the jury nonetheless concluded that Dr. Tama had not been negligent.

Ignored by the dissent are the specific interrogatories that formed the basis for the jury verdict. During the charge on liability, the court did not discuss the possibility of a future cause of action. The first interrogatory was: "Do you find that defendant, Dr. Albert Tama, was negligent?" The second interrogatory had three parts, which were to be answered only if the jury found that Dr. Tama had been negligent. Part (a) of the second interrogatory was: "Do you find that the negligence increased the risk of harm to the plaintiff Mary Ann Campo and that said increased risk of harm was a substantial factor in causing her ultimate injury?" Parts (b) and (c) asked the jury to calculate the percentage decrease, if any, in Mrs. Campo's chance of full recovery that any such negligence had caused. Because the jury found that Dr. Tama had not been negligent, it did not answer the second interrogatory.

Contrary to the dissent's suggestion, *post* at 139, 627 *A*.2d at 143, the jury knew what it was deciding. It knew that Mrs.

Campo had suffered a radical mastectomy, reconstructive surgery, and chemotherapy. It also heard testimony from Mrs. Campo's expert, disputed by Dr. Tama's expert, that "she would, to a reasonable degree of medical probability, suffer a recurrence of the cancer, and die from its effect...." *Post* at 136, 627 *A.*2d at 141.

■ The dissent disserves the jury by suggesting that it did not understand its own decision. *Post* at 139, 627 *A.*2d at 143. The trial court's passing comment that Mrs. Campo did not suffer from cancer at the time of trial could not have confused the jury. In its charge, the court instructed the jury:

> Should cancer develop, then the plaintiff may then bring a separate action for the cancer. But since it does not now exist, the court has ruled that there cannot be any such claim and no award is to be made by you with regard to that. Your determination with regard to negligence and whether there was the increased risk of harm as I have delineated it to you: If that determination is no, either as to one or the other so that you have found no liability, [that determination] will also apply to any future action. [Punctuation altered.]

A fair reading of the instruction supports the conclusion that the jury knew its determination of negligence would bar any future action. In brief, the court instructed the jury that although Mrs. Campo would have a future cause of action if the cancer were to recur, any verdict regarding negligence or increased risk of recurrence would be binding in any such action.

To conclude, we find that because plaintiffs' expert testified that a recurrence of Mrs. Campo's cancer was probable, the trial court erred in not allowing plaintiffs to prove damages that plaintiffs would incur were Mrs. Campo to suffer a recurrence. The court also erred in instructing the jury that plaintiffs could maintain a second action if she should suffer a recurrence. Those errors, however, were not capable of producing an unjust result. *See R.* 2:10–2. We do not reach the question left open in *Evers v. Dollinger,* 95 *N.J.* 399, 412, 471 *A.*2d 405 (1984), whether an unquantified or unquantifiable increase in the risk of harm without a recurrence is an actionable element of damages in a malpractice action. Nor do we reach the question whether the *Ayers/Mauro*

Rule applies in medical-malpractice actions in which a recurrence is not reasonably probable.

The judgment of the Appellate Division is affirmed.

O'HERN, J., dissenting.

Despite evidence that Mary Ann Campo's breast cancer had not been promptly diagnosed and that she would, to a reasonable degree of medical probability, suffer a recurrence of the cancer, and die from its effect, the trial court refused to treat such probable recurrence as an issue in the case and incorrectly instructed the jury that a separate action could be brought later if the cancer recurred. In addition, although no doctor could safely say, in circumstances such as this, following a treatment of breast cancer through mastectomy, that the cancer had been cured, the trial court expressly told this jury that the cancer "does not now exist."

That statement was medically incorrect. The Court also concedes that the trial court erred in handling the recurrence issue. Nevertheless, the Court denies plaintiffs a new trial because it finds one phrase in the jury instructions that the Court believes adequately impressed on the jury the understanding that it was evaluating a physician's conduct to see whether it had contributed to cause an otherwise-preventable spread of cancer.

Like other members of the Court, *Frame v. Kothari*, 115 *N.J.* 638, 651, 560 *A.*2d 675 (1989) (Wilentz, C.J., and Garibaldi, J., concurring), I share a concern about the ever-increasing complexity of medical reparations. I would hope that these doctor-patient disputes might be resolved in some way other than through our civil trial system. That system is expensive, unpredictable, and burdensome to both patient and physician. But so long as we have the system, we cannot add to its vicissitudes that a patient should suffer, in addition to medical malpractice, judicial error in her trial. The Court concedes that such judicial error exists:

Dr. Glover had testified that because of the delay in diagnosis, Mrs. Campo would probably suffer a recurrence of cancer. That testimony entitled Mrs. Campo

to a jury determination on the probability of a recurrence and future medical costs. If future damage is reasonably probable, plaintiffs may recover for it at present. The trial court should have allowed Dr. Glover to testify before the jury regarding her estimate of the costs that would occur if Mrs. Campo were to suffer a recurrence of cancer.

[*Ante* at 131–132, 627 *A.*2d at 139 (citations omitted).]

Plaintiffs' claim is not just about an "estimate of the costs that would occur if Mrs. Campo suffered a recurrence of cancer." It is about dying from cancer; it is about a life that will, in medical probability, be lost or shortened due to the cancer, in part because of the delay in diagnosis.

The issues were complex indeed, requiring the jury to evaluate the extent to which Dr. Tama's failure promptly to order a biopsy or aspiration of the breast mass in 1985 might have contributed to the spread of Mrs. Campo's cancer. Plaintiffs' expert witness, Dr. Donna Glover, was prepared to testify concerning the cost of future medical expenses related to a recurrence of cancer when, in ruling on a defense objection, the court first stated in the presence of the jury:

In the event of recurrence * * *, those events [presumably the cost of future treatment and attendant discomfort due to chemotherapy and failure of other bodily functions], there is an appropriate remedy in the nature of what we have termed a survival action as well as a wrongful death action which would be appropriate.

Plaintiffs' counsel repeatedly requested the court to correct this misunderstanding. In a sidebar colloquy with counsel, presumably not heard by the jury, the court explained that it would allow jury consideration of fear of cancer, "[b]ut until cancer develops there is no right to bring an action for cancer and that action accrues when the cancer occurs." The court nevertheless agreed to hear Dr. Glover's testimony in a *Rule* 8 proceeding before making a final admissibility determination.

At the hearing, Dr. Glover explained that because of the delayed diagnosis Mrs. Campo had a "high probability of recurrence, certainly above 50%," and that if the cancer recurred Mrs. Campo would "die * * * within a matter of less than a few years." Dr. Glover explained that

the majority of patients who die with metastatic breast cancer have diffuse involvement of multiple organs usually involving lung, bone, often skin, occasionally liver, brain. If they have that type of diffuse involvement, they usually have several in-patient hospital admissions prior to their death [ ] [a]nd often require chemotherapy for prolonged periods of time.

The jury, of course, heard none of this testimony. Defense counsel, after agreeing with the trial court that our law "doesn't preclude someone from bringing an action if something occurs in the future," insisted that the proffered evidence "does not rise to that level of reliability that is required for damages." The court agreed to keep the evidence from the jury, reasoning that it would be "more prudent under all of the circumstances to follow what has been established in the asbestos cases." The court was referring to *Mauro v. Raymark Industries, Inc.*, 116 *N.J.* 126, 561 *A.*2d 257 (1989), in which this Court held that exposure to asbestos did not warrant present recovery for the increased risk of cancer, absent proof that it is more probable than not that the plaintiff will develop the disease. But this is not an asbestosis case in which the risk of contracting cancer is uncertain. This is a case in which there was evidence that the plaintiff would probably die from cancer.

I do not see how the following assumption is fair or reasonable: that a jury that has been told a patient has no cancer will be evaluating the care provider's conduct to determine whether the conduct had caused cancer. Negligence is always related to risk. For example, the jury in this case was evaluating, in part, the damages attributable to the need for radical mastectomy, recon-structive surgery, and chemotherapy. The jury may well have concluded that no matter how prompt the intervention, a need for those procedures might have existed. Defense counsel had ham-mered this point home in his cross-examination of Dr. Glover, asking her to review an answer she gave previously in depositions, "that it probably would be a good idea to * * * have done a mastectomy" on Mrs. Campo. In other words, no matter how early the diagnosis, Mrs. Campo probably would have needed the breast surgery and some type of definite therapy. Nevertheless, the risk that such procedures might be needed is simply not the

same as the risk that one will die or suffer a shortened life due to a non-diagnosed cancer. Paradoxically, the trial court had permitted Dr. Glover to testify in front of the jury that Mrs. Campo's life expectancy would be shortened and that if the recurrence developed, which was medically probable, she would die within a few years after the recurrence. But the jury could have only been confused by the court's statement that a "wrongful death action" or a "survival action" would provide an adequate remedy in the event of a recurrence. I am not confident that one phrase in a forty-four page jury charge explained to the jury that it was evaluating that risk, especially when the court had specifically told the jury that, "Should cancer develop, then the plaintiff may then bring a separate action for the cancer." Nor is the risk of fear of developing cancer, something that we all share to a greater or lesser degree, the same as the risk of getting cancer. There was evidence in this case that Mrs. Campo had, as a result of earlier development of fibroid cysts, become increasingly fearful of developing cancer.

It has taken years for this Court to digest the doctrines of enhanced risk and preexisting causation in medical-negligence cases. *See Olah v. Slobodian,* 119 *N.J.* 119, 574 *A.*2d 411 (1990); *Evers v. Dollinger,* 95 *N.J.* 399, 471 *A.*2d 405 (1984). To assume that this jury fully grasped the significance of these words in the court's charge asks too much:

> But since [cancer] does not now exist, the court has ruled that there cannot be any such claim and no award is to be made by you with regard to that, your determination with regard to negligence and whether there was the increased risk of harm as I have delineated to you. If that determination is no, either as to one or the other so that you have found no liability, [it] will also apply to any future action.

I suspect that jurors would not draw the fine line that the Court does in parsing those phrases in the charge. The Court assumes that the jury fully understood that its evaluation of negligence was related to the recurrence of cancer, as though we expect jurors to say to themselves: "This case is not about cancer, I have been told that there is no cancer, but I am to evaluate the neglect as though there were a medical probability of cancer." On this record, the Court expects too much.

As Justice Handler recently reminded us: "Common sense would dictate that a single excerpt, ripped from its setting within the entire charge, cannot possibly determine whether the charge as a whole correctly conveyed the relevant law." *Feldman v. Lederle Laboratories,* 132 *N.J.* 339, 364, 625 *A.*2d 1066 (1993) (Handler, J., dissenting); *see also* Walter W. Steele, Jr. .and Elizabeth G. Thornburg, *Jury Instructions: A Persistent Failure to Communicate,* 67 *N.C.L.Rev.* 77, 78 (1988) (noting that "[r]ecent social science research has demonstrated empirically that juror comprehension of instructions is appallingly low"). We have always emphasized that juries must understand the import of their findings. Thus, in comparative negligence cases juries should be given an ultimate outcome charge that explains how their numerical findings will determine the outcome of the case. *See Buckley v. Pirolo,* 101 *N.J.* 68, 500 *A.*2d 703 (1985); *Roman v. Mitchell,* 82 *N.J.* 336, 413 *A.*2d 322 (1980). In a case such as this, if the jury's findings were to be given conclusive effect on the recurrence issue the jury should have been explicitly instructed as follows:

> We are reserving the issue of damages due to any recurrence of cancer for a future trial. However, if you find in this case that there was no deviation from accepted medical standards, plaintiff will be at the end of the line for any future possible recovery should cancer recur.

Only vaguely did the trial court refer to that effect. The jury may have remembered that in the earlier discussion of Dr. Glover's offer of testimony on future damages the court had said there could be a "survival action" or a "wrongful death action."

For jurors, the judge is an imposing authority figure. This judge had reinforced his status in opening remarks to the jury by stating that he was "supreme in [his] sphere," which included "presiding over the trial and, of course, seeing to it that it was conducted in accordance with the principles and rules of law." Jurors "crave" guidance from the court "because they do not get it anywhere else." *Symposium Issue on the Selection and Function of the Modern Jury, Panel One: What Empirical Research Tells Us, and What We Need to Know About Juries and the Quest for Impartiality,"* 40 *Am.U.L.Rev.* 547, 556 (1991). The court was

wrong on the law (and perhaps understandably so because of the extreme complexity of the subject) and wrong on the facts (that plaintiff was free of cancer, a point that even defense counsel recognized—"there is a risk she may have it," albeit "unquantifiable"). We ought not compound those errors now by expecting jurors to understand and grasp the nuances in his charge.

I repeat, no one expects physicians to do the impossible. Sometimes disease is untreatable and incurable. Most patients expect, however, that physicians will not fall short of acceptable medical standards in treating them. Some patients believe that they have a legal right to vindicate those expectations through the civil-justice system. We have an obligation to administer that system under acceptable legal principles.

I would grant plaintiffs a new trial.

HANDLER and STEIN, JJ., join in this opinion.

*For affirmance*—Chief Justice WILENTZ, and Justices CLIFFORD, POLLOCK and GARIBALDI—4.

*For reversal and remandment*—Justices HANDLER, O'HERN and STEIN—3.