750 A.2d 79

SAUL WANETICK, PLAINTIFF–APPELLANT, v. GATEWAY MITSUBISHI, OCT PARTNERSHIP T/A GATEWAY MITSUBISHI, GLENN SWENSON AND LARRY EVANS, DEFENDANTS–RESPONDENTS, AND EMCO'S NEW GATEWAY TOYOTA AND JOHN DOE INDIVIDUALS AND CORPORATIONS, DEFENDANTS.

Argued January 3, 2000—Decided May 10, 2000.

*Ronald L. Lueddeke* argued the cause for appellant.

*Kevin M. McKeon* argued the cause for respondents (*Marshall, Dennehey, Warner, Coleman & Goggin,* attorneys).

The opinion of the Court was delivered by

VERNIERO, J.

In this consumer fraud action, the jury awarded plaintiff compensatory damages, which the trial court thereafter trebled pursuant to *N.J.S.A.* 56:8–1 to –91 (Consumer Fraud Act or Act). The court also awarded counsel fees. The question to be decided on appeal is whether the trial court erred by not giving the jury an "ultimate outcome charge." That charge would have informed jurors that under the Act the court was required to treble damages and award counsel fees in the event they returned a verdict in plaintiff's favor.

Within the context of a consumer fraud action, the question is one of first impression. The Appellate Division concluded that the trial court committed error by not giving the charge and by incorrectly instructing jurors on the issue of punitive damages. The panel remanded the matter for a new trial. *Wanetick v. OCT Partnership,* 318 *N.J.Super.* 156, 723 *A.*2d 100 (App.Div.1999). We agree that the trial court erred but conclude that the error was harmless. Thus, we affirm in part, reverse in part, and reinstate the judgment in favor of plaintiff.

## I.

The pertinent facts and procedural history may be summarized briefly. According to plaintiff, he and his wife went to defendant's dealership on August 11, 1994 in response to a newspaper advertisement concerning the 1994 Mitsubishi Galant ES. A salesperson showed plaintiff the advertised model and allowed plaintiff's wife to test drive it. The parties then discussed the vehicle's price. According to plaintiff, the salesperson said he could go as low as $15,000 but plaintiff did not agree to the transaction. The Waneticks began to leave the dealership when, according to plaintiff, the salesperson "went after them" and told them he could "give [them] a good deal if [they] pay it out," an arrangement that purportedly would allow the customer to pay a certain amount of the purchase price each month until he paid off the outstanding debt. The

salesperson allegedly indicated to plaintiff that if he would "[go] that way, it would only be $13,000."

After approximately two and one-half hours at the dealership, plaintiff executed several documents. He was seventy-three years old at the time of the transaction. Plaintiff claimed that one of the documents he signed was folded over so that only the signature line was visible. He testified that it was sometime later, after he took delivery of the car, that he realized the document he had signed was a lease, not a contract for sale. Plaintiff testified that, after protesting by telephone to the salesperson, he was told that he could keep the lease or sign a new contract to purchase the vehicle for $23,000. Plaintiff further testified that he did not want to execute a new contract but he "just signed it" because he was so "disgusted" by what had transpired and he did not want to be saddled with a lease. He executed the new contract on August 19th, eight days after the original transaction. The total purchase price under the new agreement was $23,164. Within one week, plaintiff paid off the entire amount due because, as he stated, he wanted to save interest and felt he was "paying so much money for this car."

Defendants recounted a different version of the transaction. The salesperson clearly recalled discussing a lease with plaintiff and stated that he "told [him] how it would be a low monthly payment for three years ... and everything that needs to be explained about leasing." The salesperson further testified that the day after plaintiff took delivery of the vehicle, plaintiff "called and said he didn't want to lease the car no more." The salesperson then communicated that call to his manager who purportedly said that plaintiff could "switch from a lease to a finance, no problem, [tell him to] come back."

Plaintiff filed a complaint against defendants on December 22, 1994, alleging common-law fraud, breach of contract, negligence, and violations of the Consumer Fraud Act, the Uniform Commercial Code, *N.J.S.A.* 12A:2–101 to –725, and the Magnuson–Moss Warranty Act, 15 *U.S.C.A.* §§ 2301 to 2312. Plaintiff thereafter

filed an amended complaint adding claims for intentional and negligent infliction of emotional distress.

Defendants filed an answer to both complaints, essentially denying all allegations. The trial commenced on September 22, 1997, and lasted one week. After plaintiff submitted his case in chief, the trial court dismissed all claims except those relating to the Consumer Fraud Act, breach of contract, and common-law fraud. At the charge conference on the last day of trial, the trial court had to decide whether to instruct the jury on the ultimate outcome of any verdict. The court recognized that there was a split of authority concerning that question and decided not to give the charge, believing that it "might be unduly prejudicial and that [it] might have the effect of causing the jury to discount any findings they might make as to that." The trial court did, however, charge the jury on the issue of punitive damages. The court instructed that "[p]unitive damages are awarded in connection with the plaintiff's fraud claim only. The law does not provide for punitive damages on the breach of contract or consumer fraud action."

The jury found defendants liable for breach of contract and for violations of the Act, but found no liability under common-law fraud. The jury awarded compensatory damages in the amount of $7,300. The court thereafter trebled that amount as required by the Act and also awarded attorneys fees and costs totaling $23,-638.59. Thus, plaintiff's final award amounted to $45,538.59.

Defendants appealed. In addition to the ultimate-outcome question, the Appellate Division addressed two other issues, namely, whether there was sufficient evidence for the jury to decide the common-law fraud claim, and whether the trial court committed reversible error in admitting certain evidence. The court found for plaintiff on both issues. *Wanetick, supra,* 318 *N.J.Super.* at 159, 723 *A.2d* 100. In respect of the ultimate-outcome issue, the Appellate Division held that it was error for the trial court to refuse to give that charge and also that the trial court erred in its instruction regarding punitive damages. The panel set aside the jury's verdict and remanded the matter for a new trial. We

granted plaintiff's petition for certification, 160 *N.J.* 479, 734 *A.*2d 794 (1999), which is limited solely to the ultimate-outcome question.

## II.

■ The Consumer Fraud Act provides that "[i]n any action . . . the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest." *N.J.S.A.* 56:8–19. The statute also provides that "the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit." *Ibid.* As we recently explained, two of the three main purposes of the Act are "to punish the wrongdoer through the award of treble damages, and, by way of the counsel fee provision, to attract competent counsel to counteract the community scourge of fraud by providing an incentive for an attorney to take a case involving a minor loss to the individual." *Lettenmaier v. Lube Connection, Inc.,* 162 *N.J.* 134, 139, 741 *A.*2d 591 (1999) (citations omitted). The third purpose is to compensate victims for actual losses. *Ibid.*

■ The provisions pertaining to the trebling of damages and awarding of counsel fees are integral and essential to the Act. *Cox v. Sears, Roebuck & Co.,* 138 *N.J.* 2, 24, 647 *A.*2d 454 (1994) (explaining that "the legislative history indicates that the provision for attorneys' fees was intended to impose on the defendant in a private action 'a greater financial penalty [than in an action brought by the Attorney General] and . . . [to ensure] that the financial cost to the private plaintiff was minimized and compensation maximized'"); *see also Gennari v. Weichert Co. Realtors,* 148 *N.J.* 582, 604, 691 *A.*2d 350 (1997) (describing history of Act and observing that "the Act has protected consumers from deception and fraud, even when committed in good faith").

The courts below correctly observed that there is a split of authority concerning whether juries should be instructed on the ultimate outcome of their verdicts in the consumer-fraud context. As noted by the Appellate Division, *Wanetick, supra,* 318 *N.J.Su-*

*per.* at 160–61, 723 *A.*2d 100, the Committee comments to the Model Jury Charge, Civil § 4.23, contain this succinct summary of the divergence of opinions:

As set up, the model charge does not indicate to the jury that damages they may award under the Act are trebled. *N.J.S.A.* 56:8–19 directs the court to award treble damages.

There are two points of view concerning this approach. The Committee is unaware of any court decision in this State directly on point, and therefore, one can only reason by analogy.

The first viewpoint is based on a line of federal cases. These include *Webster Motor Car Co. v. Packard Motor Car Co.*, 135 *F.Supp.* 4, 11 (D.D.C.1955)[, *rev'd on other grounds*, 243 *F.*2d 418 (D.C.Cir.), *cert. denied*, 355 *U.S.* 822, 78 *S.Ct.* 29, 2 *L.Ed.*2d 38 (1957) ]; *Semke v. Enid Automobile Dealers Assn.*, 456 *F.*2d 1361, 1370 (10th Cir.1972); and *Pollock & Riley, Inc. v. Pearl Brewing Co.*, 498 *F.*2d 1240, 1242 (5th Cir.1974). Generally, the rationale against advising the jury about the trebled damages concept is, one, that the implementation of a trebling of damages is a function for the court, not the jury, and therefore no useful purpose is served by communicating that consequence to the jury; and two, the jury might adjust its award downward and, accordingly, thwart the purposes underlying the statute.

The second viewpoint reasons from an analogy to the "ultimate outcome charge" directed in *Roman v. Mitchell*, 82 *N.J.* 336, 413 *A.*2d 322 (1980). If the ultimate outcome is to be stated to a jury in a personal injury action, why should juries be treated differently in Consumer Fraud Act cases. Moreover, can it not be said that, by not advising of trebled damage[s], the jury may be confused since some of the jurors may be aware of the remedy. *See also Bordonaro Bros. Theatres, Inc. v. Paramount Pictures, Inc.*, 203 *F.*2d 676 (2d Cir.1953), in which it was observed that since the pleading contained a demand for treble damage[s], it was proper to so advise the jury.

The Committee merely notes that there is no New Jersey case law on point and the Committee takes no position on the question.

Although this Court has never addressed the ultimate-outcome issue within the context of a consumer fraud action, we have addressed it in other settings. The leading case is *Roman v. Mitchell*, 82 *N.J.* 336, 413 *A.*2d 322 (1980). There, a jury found the twelve-year-old plaintiff seventy-five percent at fault in a negligence action commenced after the plaintiff was struck by the wheel of a dump truck while riding his bicycle on the New Jersey Turnpike. The jury was not instructed that under the comparative-negligence statute then in existence, *N.J.S.A.* 2A:15–5.1 to – 5.3, the legal effect of their verdict would be to preclude plaintiff's recovery because he was more than fifty percent at fault.

This Court agreed with the plaintiff in *Roman* that the ultimate outcome charge should have been given. As we explained, "a jury in a comparative negligence situation should be given an ultimate-outcome charge so that its deliberations on percentages of negligence will not be had in a vacuum, or possibly based on a mistaken notion of how the statute operates." *Roman, supra,* 82 *N.J.* at 345, 413 *A.*2d 322. We also emphasized that "a jury informed of the legal effect of its findings as to percentages of negligence in a comparative negligence trial is better able to fulfill its fact finding function." *Id.* at 346, 413 *A.*2d 322. Our holding contained an important exception, namely, that "in a complex case involving multiple issues and numerous parties, the trial court, in the exercise of sound discretion, could withhold the instruction if it would tend to mislead or confuse the jury." *Id.* at 346–47, 413 *A.*2d 322.

We again addressed the question in the context of a medical malpractice action, *Fischer v. Canario,* 143 *N.J.* 235, 670 *A.*2d 516 (1996). In that case, the jury was not informed that its verdict would be apportioned in keeping with the rule announced in *Scafidi v. Seiler,* 119 *N.J.* 93, 114, 574 *A.*2d 398 (1990)(requiring trial courts to mold certain medical-malpractice verdicts to limit a defendant's liability to value of lost chance for plaintiff's recovery attributable to defendant's negligence). Relying on the rationale expressed in *Roman,* we concluded that jurors must be told of the *Scafidi* damage-apportionment rule, explaining:

> The value of an ultimate outcome charge in lost-chance cases is that it informs the jurors of the effect of their causation apportionment. The charge makes clear to jurors that they are to award full damages, and the *trial court* will make any necessary adjustments in light of their findings. Without the charge, there is the risk that the jurors will reduce their damage award in light of the apportionment of fault they find as part of their verdict. Then, once the trial court makes the same reduction, the plaintiff would receive an inadequate recovery. When a *Scafidi* damage-apportionment rule is applicable, an ultimate-outcome charge generally should be given.
>
> [*Fischer, supra,* 143 *N.J.* at 254, 670 *A.*2d 516.]

We reached the opposite conclusion and declined to require an ultimate-outcome instruction in *Weiss v. Goldfarb,* 154 *N.J.* 468,

713 *A*.2d 427 (1998), a case involving the statutory limitations on a hospital's liability under the Charitable Immunity Act, *N.J.S.A.* 2A:53A–8. In *Weiss,* the jury determined that the negligence of the defendant hospital was the proximate cause of the plaintiff's death and returned a verdict against the hospital in the amount of $150,000. The jury also returned a verdict of no cause of action in favor of the three other defendants in the case, all physicians. *Id.* at 471, 713 *A.*2d 427. At the time of the jury's verdict, the Charitable Immunity Act provided that the liability of non-profit hospitals such as the defendant could not exceed $10,000. *Ibid.* Accordingly, the trial court molded the verdict and entered judgment for that amount. *Ibid.*

The Appellate Division reversed, concluding that the plaintiff was entitled to an ultimate-outcome instruction informing the jury of the hospital's limited liability. This Court thereafter reversed the Appellate Division because of concern over possible prejudice to the individual defendants whose liability was not so limited. We stated: "We are convinced that the prejudicial effect of such an instruction could be to shift to other defendants some percentage of negligence that the jury thought should rightfully be assessed against the hospital." *Id.* at 481, 713 *A.*2d 427. We distinguished the case from *Roman* and *Fischer,* explaining:

> We find persuasive the hospital's argument that informing a jury about a hospital's limited liability is akin to telling a jury whether a defendant is insured and the amount of coverage and is at least as prejudicial as telling it about insurance coverage. Such a prejudicial effect would be the antithesis of what *Roman* and *Fischer* anticipated. Informing a jury of the liability cap also violates the legislative policy expressed in the Charitable Immunity Act of protecting non profit hospitals and the Legislature's desire to withhold from juries the existence of statutory limits on monetary awards.

> [*Id.* at 481–82, 713 *A.*2d 427.]

Our holding in *Weiss* was based on the overarching concern for fairness to all parties in litigation. That concern is heightened when a defendant who enjoys statutory immunity is tried in the same action with defendants whose liabilities are not similarly capped.

## III.

An ultimate-outcome charge in a consumer fraud case does not present the risk of prejudice to multiple defendants that was evident in *Weiss*. "The punitive damages element of the Consumer Fraud Act has nothing to do with whether there is a pocket out of which a judgment may be satisfied." *Wanetick, supra,* 318 *N.J.Super.* at 165, 723 *A.*2d 100. Thus, informing jurors about the trebling of damages and the awarding of counsel fees should not result in the impermissible shifting of liability from one defendant to another, the principal concern identified in *Weiss*. Instead, we believe that such information will assist the jury in its fact-finding role and will avoid confusion especially among those jurors who may already have some notion concerning the mandates of the Act.

Like those in a comparative-negligence context, jurors sitting in a consumer-fraud case should be informed of the legal effect of their actions so that their deliberations "will not be had in a vacuum, or possibly based on a mistaken notion of how the statute operates." *Roman, supra,* 82 *N.J.* at 345, 413 *A.*2d 322. Even the well-versed and well-intended juror may be mistaken in his or her assumption about specific provisions of the law. Also, a small percentage of jurors may know or suspect that consumer-fraud actions implicate a damage-enhancement mechanism. Instructing jurors concerning the ultimate outcome of their verdicts will serve as an additional tool to assist them as they intelligently perform their duties. ₀

We acknowledge the concern expressed by the trial court and the dissent that an ultimate-outcome instruction might prejudice the thinking of some jurors or focus their attention on matters not strictly within their province. That concern is outweighed by our belief that jurors are persons of good faith, that they strive to fulfill their role without passion or prejudice toward either side, and that they work hard to abide by all instructions to the best of their ability. We simply see no compelling policy reason to justify shielding jurors from the consequences of their own actions in the

jury box. To the contrary, "[w]e have always emphasized that juries must understand the import of their findings." *Campo v. Tama*, 133 *N.J.* 123, 140, 627 *A.*2d 135 (1993) (O'Hern, J., dissenting).

■■■ That is not to say that an ultimate-outcome charge must be given in all cases. We reaffirm the important caveat expressed in *Roman*, namely, that in complex cases involving multiple questions and many parties, the trial court retains its discretion to withhold the instruction if it would tend to confuse or mislead the jury or produce a manifestly unjust result. *Roman, supra*, 82 *N.J.* at 346–47, 413 *A.*2d 322. The present suit consisted of straightforward issues and a small number of defendants. It was a relatively uncomplicated case, warranting the instruction.

Moreover, as previously noted, the Act's provisions in respect of the trebling of damages and awarding of counsel fees are integral and essential to the Act itself. We agree with the Appellate Division that those provisions are punitive in nature and reflect the Legislature's "sense of outrage over marketplace fraud [that] is potentially present in every case in which a Consumer Fraud Act violation is alleged." *Wanetick, supra*, 318 *N.J.Super.* at 165, 723 *A.*2d 100; *see also Daaleman v. Elizabethtown Gas Co.*, 77 *N.J.* 267, 272, 390 *A.*2d 566 (1978) (observing that Act's provisions providing for trebling of damages and awarding of counsel fees constitute "a punitive measure"). As the Appellate Division observed:

> Thus, jurors, like the Legislature, may well believe that something more than making the consumer whole is warranted. It is important therefore for the jury to know that its purely compensatory award will trigger an automatic punitive remedy. This will insure that the jury's sense of outrage will not be reflected either in its assessment of compensation or in some other aspect of the case. Indeed, it has no relationship to the fear expressed in *Weiss* that revealing the hospital's liability cap would shift to other defendants some percentage of negligence that the jury thought should rightfully be assessed against the hospital.
>
> A Consumer Fraud Act case is the other side of the coin. Telling the jury that, upon its finding that the Consumer Fraud Act was violated, the judge will automatically award punitive damages by trebling the verdict and granting counsel fees provides absolutely no incentive to allocate responsibility to any party except the one the jury believes to be at fault. Indeed, letting the jury know that punitive

damages will be imposed upon its finding of a violation of the Consumer Fraud Act, operates to prevent a jury from inflating the compensatory award or awarding punitive damages on another count to make its outrage known. We think the punitive aspect of the Consumer Fraud Act is necessary information for the jury to have in executing its function.

[*Wanetick, supra,* 318 *N.J.Super.* at 165–66, 723 *A.2d* 100.]

Hence, rather than increase the likelihood of unfairness to any party, an ultimate-outcome charge enhances the prospect that jurors will arrive at the correct verdict for the right reasons.

■ That said, we are not persuaded that the failure by the trial court here to instruct the jury on ultimate outcome unfairly prejudiced the parties or produced an unjust result. The jury awarded plaintiff $7,300—a relatively modest sum, which does not appear to be the product of confusion or extraneous influences such as a misconception of the law.

Similarly, although we agree with the Appellate Division that it was incorrect for the trial court to inform the jury that punitive damages were not available in this case, we do not believe that the delivery of that charge constituted reversible error. We do not find on this record that the jury was confused by the erroneous instruction or that the error resulted in an unjust outcome. Thus, the jury's verdict should not be disturbed on appeal. *Sons of Thunder, Inc. v. Borden, Inc.,* 148 *N.J.* 396, 690 *A.2d* 575 (1997); *see also Fisch v. Bellshot,* 135 *N.J.* 374, 392, 640 *A.2d* 801 (1994) (noting that "[c]ourts uphold even erroneous jury instructions when those instructions are incapable of producing an unjust result or prejudicing substantial rights").

IV.

■ For the reasons stated, we hold that trial courts must instruct jurors concerning the ultimate outcome of their verdicts in cases arising under the Consumer Fraud Act and tried after the date of this opinion. Although we are in accord with that portion of the Appellate Division's opinion requiring that an ultimate-outcome charge be given in such cases, we reverse its judgment

remanding the case for re-trial. The Law Division's judgment in favor of plaintiff is reinstated.

COLEMAN, J., concurring in part and dissenting in part.

I concur in that portion of the judgment of the Court reinstating the trial court's award to plaintiff of compensatory and treble damages, counsel fees, and costs. I disagree, however, with the Court's holding that an ultimate outcome instruction should be given in a Consumer Fraud Act case.

The Consumer Fraud Act, *N.J.S.A.* 56:8–19, directs the court, not the jury, to award treble damages. Thus, by statute, the implementation of trebling the damages is the court's function. Had the Legislature intended to have the jury award treble damages, it would have said so. Telling the jury that the court will treble the damages is simply a subtle way of informing the jury to keep its damages award to a minimum because the court will treble them. A downward adjustment by the jury would defeat one of the purposes of the Act: "to punish the wrongdoer through the award of treble damages." *Lettenmaier, supra,* 162 *N.J.* at 139, 741 *A.*2d 591 (citation omitted).

The factors driving the ultimate outcome charge directed by *Roman* in modified comparative negligence cases are not analogous to this case. There, the purpose of the charge was to inform the jury that an intent to reduce a plaintiff's damages by the percentage of the plaintiff's own negligence may not have that legal effect because a plaintiff more than fifty percent negligent could not recover any damages. The fact that New Jersey has a modified, rather than a pure, comparative negligence statute, *N.J.S.A.* 2A:15–5.1, drove the ultimate outcome instruction in *Roman. Weiss, supra,* 154 *N.J.* at 476–77, 713 *A.*2d 427. Similarly, in a *Scafidi*-type case, an ultimate outcome instruction is given to inform a jury of the legal effect of the apportionment of the harm caused by a defendant's negligent medical treatment and the harm caused by the patient's preexisting medical condition. *Id.* at 478, 713 *A.*2d 427 (citation omitted).

An alleged violation of the Act is more akin to federal antitrust cases that hold an ultimate outcome charge should not be given to the jury. *Pollock & Riley, Inc. v. Pearl Brewing Co.*, 498 *F.*2d 1240, 1242 (5 th Cir.1974), *cert. denied*, 420 *U.S.* 992, 95 *S.Ct.* 1427, 43 *L.Ed.*2d 673 (1975); *Semke v. Enid Auto. Dealers Ass'n*, 456 *F.*2d 1361, 1370 (10 th Cir.1972); *Webster Motor Car Co. v. Packard Motor Car Co.*, 135 *F.Supp.* 4, 11 (D.D.C.1955), *rev'd on other grounds*, 243 *F.*2d 418 (D.C.Cir.1957), *cert. denied*, 355 *U.S.* 822, 78 *S.Ct.* 29, 2 *L.Ed.*2d 38 (1957). "There [is] no reason for informing the jury that whatever damages they would award would be trebled, because this is a matter solely for the court." *Webster, supra*, 135 *F.Supp.* at 11.

In a consumer fraud case, where comparative fault or apportionment of liability is not an issue, the role of the jury is to determine what *compensatory* economic damages flow from a violation of the Act. The jury is not asked to decide treble damages or to make a comparative assessment of fault or damages. The Model Jury Charge properly limits the role of the jury to determining the actual economic damages proximately caused by the defendant's violation of the Act. Damages under the Act do not include noneconomic loss. *Gennari v. Weichert Co. Realtors*, 148 *N.J.* 582, 613, 691 *A.*2d 350 (1997). Thus, knowledge that the judge will treble the economic damages is not only irrelevant to the jury's performance of its function, but such knowledge likely will be prejudicial to the plaintiff while at the same time thwarting the legislative intent of requiring exemplary damages. Because the Act separates the role of the jury from that of the judge, and because the jury is not called upon to make a comparison of fault or damages, I disagree with the majority's faulty reasoning that because "the trebling of damages and awarding of counsel fees are integral and essential to the Act itself," an ultimate outcome instruction is required. *Supra*, at 495, 750 *A.*2d at 85. Hence, I dissent from the Court's requirement that an ultimate outcome instruction be given in cases tried under the Act.

*For affirmance in part and reversal in part*—Chief Justice PORITZ, and Justices O'HERN, GARIBALDI, STEIN, and VERNIERO—5.

*Concurring in part and dissenting in part*—Justice COLEMAN—1.